Richard C. Osborne
1919 Pennsylvania Ave. N.W., Ste. 400
Washington, DC 20006
(202) 955-0095
*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

FELLOWSHIP OF CHRISTIAN ATHLETES, FELLOWSHIP OF CHRISTIAN ATHLETES OF HOPEWELL VALLEY CENTRAL HIGH SCHOOL, and FELLOWSHIP OF CHRISTIAN ATHLETES OF TIMBERLANE MIDDLE SCHOOL,

*Plaintiffs*,

v.

BOARD OF EDUCATION OF THE HOPEWELL VALLEY REGIONAL SCHOOL DISTRICT; ROSETTA D. TREECE, Superintendent of Hopewell Valley Regional School District, in her official and personal capacities; DARYL MINUS-VINCENT, Interim Executive County Superintendent of Mercer County for the New Jersey Department of Education, in his official and personal capacities; and LILY LAUX, Commissioner of the New Jersey Department of Education, in her official capacity only,

*Defendants*.

**Civil Action No.** 3:26-cv-10163

**COMPLAINT**

**JURY TRIAL DEMANDED**

## LOCAL CIVIL RULE 10.1 STATEMENT

The mailing addresses of the parties to this action are:

Fellowship of Christian Athletes
8701 Leeds Road
Kansas City, Missouri 64129

Fellowship of Christian Athletes of Hopewell Valley Central High School
c/o FCA New Jersey
6 Drummond Pl.
Red Bank, New Jersey 07701

Fellowship of Christian Athletes of Timberlane Middle School
c/o FCA New Jersey
6 Drummond Pl.
Red Bank, New Jersey 07701

Board of Education of the Hopewell Valley Regional School District
425 South Main Street
Pennington, New Jersey 08534

Dr. Rosetta D. Treece
Superintendent, Hopewell Valley Regional School District
425 South Main Street
Pennington, New Jersey 08534

Dr. Daryl Minus-Vincent
Interim Executive County Superintendent of Mercer County
New Jersey Department of Education
1075 Old Trenton Road
Trenton, New Jersey 08690

Dr. Lily Laux
Commissioner of Education
New Jersey Department of Education
100 Riverview Plaza
P.O. Box 500
Trenton, New Jersey 08625-0500

## NATURE OF THE ACTION

1. Religious discrimination has no place in public schools. But that is precisely what is happening in the Hopewell Valley Regional School District (the District). The District imposes one set of rules for secular student groups and another for the Fellowship of Christian Athletes (FCA)—solely and expressly because FCA is religious. While other student groups benefit from regularly hosting adult volunteers (a resource often crucial to the groups' long-term health), the District has declared that for "religious clubs," "no outside individuals are permitted" at all. This damaging double standard is precisely the type of discrimination the Constitution and civil-rights law forbid.

2. FCA is a religious ministry for student-athletes with affiliated student groups on thousands of college, high-school, and middle-school campuses across the country. Within the District, students at Timberlane Middle School (Timberlane) and Hopewell Valley Central High School (Central) have organized student FCA chapters, called "huddles," in which they study the Bible, pray, support one another in their journeys of faith and athletics—and eat pizza. These huddles have operated within the District for years without incident.

3. Although the huddles are student-initiated and student-led, they also invite local members of the FCA staff and other adult volunteers to attend their meetings, just like other student clubs invite volunteers of their own. FCA staff and volunteers

help support and mentor students, answer questions, assist in leadership development—and generally bring the pizza.

4. But for an organization called the Freedom From Religion Foundation (FFRF), this was too much. In March 2025, FFRF wrote to the District to complain about "FCA activities" within the District. FFRF asserted that FCA's "outside religious representatives" were being given "unique access to" District students and "treat[ing] schools as a recruiting ground for their religious mission." And FFRF demanded that the District "investigate and ensure that outside adults are not permitted to regularly lead, attend, or participate in student religious clubs."

5. The District acquiesced within a matter of days, telling FFRF (through counsel) that it had "investigat[ed]" and was taking action against FCA. And the District went even further than FFRF demanded. Before the 2025-26 school year began, the District announced a new policy categorically forbidding any "outside individuals" from attending any meetings of "religious clubs" at all, claiming that "the law" (they didn't say which one) "stipulates" it.

6. But the District got the law backwards. As District officials have repeatedly admitted and even emphasized, the District's new policy (in a school official's words) "singles out religious groups only." That is just what the Supreme Court has said again and again that governments cannot do: they cannot "single out the

religious for disfavored treatment." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 460 (2017).

7. And that is just what Congress has even more specifically said that *public schools* cannot do with respect *to religious student clubs*. In the Equal Access Act, Congress expressly barred public secondary schools like those in the District from "deny[ing] equal access" to or "discriminat[ing] against" student groups "on the basis of the religious ... content of the speech at [their] meetings." 20 U.S.C. § 4071(a). As the Supreme Court has explained, Congress passed this law "by wide, bipartisan majorities" precisely to address "widespread discrimination against religious speech in public schools," of the sort the District is now engaging in. *Bd. of Educ. of Westside Cmty. Schs. v. Mergens by and through Mergens*, 496 U.S. 226, 239 (1990). This equal-access mandate has redounded to the benefit of all groups—including nonreligious ones—nationwide.

8. And make no mistake: the District's new religious-clubs-only volunteer ban does indeed discriminate against religious clubs and single them out for disfavored treatment. While FFRF had claimed that FCA's adult supporters were being given "unique access" to students, this is simply false. The District expressly permits adult visitors on its campuses for a variety of different reasons. And other non-religious student groups are allowed to—and regularly do—take advantage of this permission as a matter of course.

9. For example, the high-school Robotics Club actively solicits outside visitors to serve as adult mentors, not only to help kids build robots but also to manage the club's operations. The Youth Environmental Society invites outside guests to present at their "Lunch and Learn" programs. The Community Connections Club invites guest speakers for monthly presentations, and the SHADES club exists to permit networking and connections between and among students and adult facilitators. Those are just a handful of the available examples, and just from the District's Central High School campus—there are many others within the rest of the District.

10. It's all to the good that the District is allowing other clubs to avail themselves of what the District itself calls the "benefit[s]" of outside "volunteers," including "knowledge, personalization, and caring role models." Those benefits make the clubs more valuable and effective for students and give the clubs far more durability and stability over time. The trouble is that the District is denying these same benefits to FCA, and for the sole reason that FCA is "religious."

11. After the District adopted this blatantly discriminatory rule, FCA students and staff repeatedly asked District officials to relent, citing the blackletter law making the District's policy unlawful. The District repeatedly refused, stating that "the district has given our position." And FCA's counsel wrote the District in December 2025, providing chapter and verse of the relevant statutes and caselaw, and asked to

dialogue to find a solution for restoring equal access. The District's counsel acknowledged receipt in January 2026 and said he'd respond but never did.

12. In the meantime, FCA huddles in the District have been denied the equal opportunity to invite and host outside volunteers for an entire school year, stripping their students of vital mentorship opportunities that are freely available to students in secular clubs.

13. The 2026-27 school year is rapidly approaching. Plaintiffs—FCA and its affiliate student groups within the District—shouldn't have to lose out on the benefit of equal access to volunteers for still more years. The District is actively and cavalierly violating the law and trampling on Plaintiffs' constitutional rights. Its discrimination must end.

## JURISDICTION AND VENUE

14. This action arises under the Constitution and the laws of the United States. The Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331, 1343, and 1367(a).

15. The Court has authority to issue the declaratory and injunctive relief sought under 28 U.S.C. §§ 2201 and 2202.

16. Venue lies in this district under 28 U.S.C. § 1391(b)(1) because all Defendants reside in the District of New Jersey.

17. Venue also lies in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims in this lawsuit occurred in the District of New Jersey.

## PARTIES

18. Plaintiff Fellowship of Christian Athletes is a religious nonprofit corporation incorporated in Oklahoma and whose principal place of business is in Missouri. FCA is a religious ministry active on thousands of school campuses throughout the United States, including in New Jersey. FCA brings this suit on behalf of itself; its student-led club affiliates at Timberlane Middle School and Hopewell Valley Central High School; and its staff, volunteer, and student members in the District. FCA has been recognized by the Internal Revenue Service as an organization described in section 501(c)(3) of the Internal Revenue Code.

19. Plaintiff Fellowship of Christian Athletes of Hopewell Valley Central High School (FCA Central) is an unincorporated association that conducts religious ministry at Hopewell Valley Central High School, a member school of the Hopewell Valley Regional School District. The association is a registered local student-club affiliate of FCA and is a recognized student group at Hopewell Valley Central High School. Its members are student attendees and leaders and the FCA staff and volunteers who attended and seek to attend its meetings. FCA Central brings this suit on

behalf of itself and its members who desire equal access to the privileges and benefits enjoyed by all other student groups in the District.

20. Plaintiff Fellowship of Christian Athletes of Timberlane Middle School (FCA Timberlane) is an unincorporated association that conducts religious ministry at Timberlane Middle School, a member school of the District. The association is a registered local student-club affiliate of FCA and is a recognized student group at Timberlane. Its members are student attendees and leaders and the FCA staff and volunteers who attended and seek to attend its meetings. FCA Timberlane brings this suit on behalf of itself and its members who desire equal access to the privileges and benefits enjoyed by all other student groups in the District.

21. Defendant the Board of Education of the Hopewell Valley Regional School District is a local school board capable under New Jersey law of suing and being sued. *See* N.J.S.A § 18A:11-2. The Board is responsible for conducting and supervising the schools within the District. *Id.* § 18A:10-1. In particular, the Board is responsible to "[m]ake, amend and repeal rules … for the government and management of the public schools … of the district." *Id.* § 18A:11-1(c). The Board must "[p]erform all acts and do all things, consistent with law … necessary for the lawful and proper conduct … of the public schools of the district." *Id.* § 18A:11-1(d).

22. Defendant Rosetta D. Treece is the District Superintendent. As superintendent, Dr. Treece is the "chief executive and administrative officer" of the Board.

N.J.S.A § 18A:17-20(b). Dr. Treece has "general supervision over all aspects … of the schools of the district." *Id.* § 18A:17-20(b). Dr. Treece was directly involved in the decision to deny equal access to FCA huddles and in the enforcement of that decision. Dr. Treece is being sued in both her official and personal capacity.

23. Defendant Daryl Minus-Vincent is the Interim Executive County Superintendent of Mercer County for the New Jersey Department of Education. As such, Dr. Minus-Vincent is responsible to "exercise general supervision over" "all of the schools" in Mercer County, including the District. *Id.* § 18A:7-8(a). Dr. Minus-Vincent also has the duty to "advise with and counsel" the Board "in relation to the performance of their duties." *Id.* § 18A:7-8(c). Dr. Minus-Vincent was directly involved in the decision to deny equal access to FCA huddles and in the enforcement of that decision. Dr. Minus-Vincent is being sued in both his official and personal capacity.

24. Defendant Lily Laux is the Commissioner of the New Jersey Department of Education. As the commissioner, Dr. Laux has "supervision of all schools of the state receiving support or aid from state appropriations." *Id.* § 18A:4-23. The commissioner is responsible to "instruct the county superintendents and superintendents of schools as to the performance of their duties" and "the conduct of the schools." *Id.* § 18A:4-29. Dr. Laux is being sued in her official capacity only.

25. All Defendants are persons acting under the color of state law. 42 U.S.C. § 1983.

26. Official-capacity Defendants are subject to suit for prospective relief under *Ex parte Young*, 209 U.S. 123 (1908).

## FACTUAL BACKGROUND

***FCA's rich history of serving students on campuses around the nation***

27. FCA was founded in 1954 as a Christian ministry and seeks to "demonstrate steadfast commitment to Jesus Christ and His Word through Integrity, Serving, Teamwork, and Excellence." *See* FCA, *Vision and Mission*, https://perma.cc/B8L3-V9ED

28. For 18 consecutive years, FCA has received 4-Star top ratings from Charity Navigator, America's largest organization rating the fiscal management of charities. This puts FCA in the top 1% of all charities rated.

29. For more than seventy years, FCA has helped student-athletes form "huddles" on college, high-school, and middle-school campuses to encourage each other to grow in their faith through prayer and Bible study. Today, FCA has over 20,000 huddles, many of which exist on public university, college, high-school, and middle-school campuses across the United States.

30. In addition to its huddle ministry, FCA also operates athletic camps and other community services for tens of thousands of students every year. FCA's

affiliated student huddles also perform charitable works in New Jersey. For instance, each year, the FCA huddles in Hopewell Valley participate in Operation Christmas Child—a ministry in which the students pack gift-filled shoeboxes to provide Christmas gifts to children in need all around the world.

31. FCA emphasizes that *all* students are invited to attend its huddles, participate in its camps, or benefit from its community support activities. *Everyone* is welcome.

32. Beyond providing a place for students to fellowship together, FCA serves schools by building community among students and encouraging service-oriented character development—which in turn helps students grow and feel welcome, safe, and motivated at school.

33. FCA fosters friendships among students and a sense of community, including among students who share common values concerning alcohol use, dating, community service, and other areas.

34. A recent study found that high-quality friendships facilitate the development of healthy autonomy and motivation for students in school. *See* Marie-Hélène Véronneau & Sophie-Caroline Trempe, *Promoting good friendship: A weapon to fight high school dropout* (June 26, 2023), https://perma.cc/VQ3D-FY5U. Solid, life-giving friendships among students are one byproduct of FCA's presence on campus through student huddles.

35. Further, studies have found that participation in religious groups on college campuses is positively associated with social integration, emotional well-being, academic success, and greater awareness of people from different races and cultures. *E.g.*, Alyssa N. Bryant, *The Effects of Involvement in Campus Religious Communities on College Student Adjustment and Development*, 8 J. Coll. & Character art. 3 (2007), https://perma.cc/V4BJ-XZF2. This holds true in high schools, as well.

36. For this reason, administrators and teachers within the District (and throughout New Jersey) have in past years thanked and praised FCA for its operations.

37. So have administrations, teachers, and schools in locations across the country.

38. "Huddle ministry" has been a critical component of FCA's religious mission from the start. Through their presence on school campuses across the country, FCA huddles have advanced FCA's ministry of welcoming coaches and athletes into a growing relationship with Jesus Christ and His church. This campus presence has been essential to FCA's religious mission because it is the platform through which FCA reaches student-athletes—exactly the audience FCA exists to serve.

39. FCA huddles meet regularly on campus, typically weekly or bi-monthly, under the guidance of student leaders and faculty advisors. These meetings can cover many activities, including prayer, religious teaching, religious counseling, planning, and ministry outreach to share the Gospel with other students.

40. Again, though, FCA huddles are not exclusive clubs with restricted membership. Instead, huddles invite students throughout the school to participate in their events, including their religious discussions, service projects, prayer times, worship, meetings, and Bible studies. All students are welcome.

41. Given the importance of huddles to FCA's religious ministry, FCA devotes significant resources to them. For instance, FCA prepares and publishes resources to provide training and guidance to FCA's staff and FCA student leaders. In addition, FCA employs and trains staff all throughout the country to support huddle ministry. In New Jersey specifically, FCA employs two Regional Directors and five Area Directors who train and support FCA's student leaders.

42. Students are indispensable to FCA's huddle ministry. Indeed, FCA huddles are initiated and led by student-athletes, and student leaders determine the specific content of the huddle's message. For example, students lead the groups' religious meetings and Bible studies; lead and participate in prayer, worship, and religious teaching; help decide the religious content of the meetings; select guest speakers and identify religious topics to cover during events; minister to their peers individually; plan and schedule ministry events on campus; communicate FCA's Christian message when interacting with administrators, staff, faculty, and students at their school; and determine what kind of outreach and service activities to engage in to advance the group's religious mission.

43. FCA considers its student leaders to be FCA Representatives—a designation they share with FCA's directors, officers, employees, and other volunteer leaders. FCA Representatives are integral to the FCA community because they express, message, and model FCA's faith on behalf of FCA and their FCA huddle.

44. Because student leaders are critical to FCA's religious mission, it is important to FCA that these student leaders be able to have free access to spiritual guidance and support from FCA's adult staff. As part of FCA's religious mission, national, regional, and local components of FCA provide religious training for student leaders about FCA's vision, core values, and ministry method. This training is specifically designed to equip student leaders to study the Bible, lead a campus huddle, and share with others their "testimonies"—the story of how they came to have a personal relationship with Jesus Christ.

45. FCA staff and volunteers—all of whom are required to get background checks and comply with FCA's stringent policies upholding student safety—provide this support by attending FCA huddles' on-campus meetings.

46. It is vital that FCA staff and volunteers can provide this spiritual guidance and leadership development to the students on the school's campus, for several reasons.

47. First, school campuses provide a safe, convenient, and consistent environment for FCA staff and volunteers to meet with both student leaders and members.

Meeting in an off-campus location would not only present transportation and logistical difficulties for middle-school and high-school students, but it would also likely deter many students from participating in FCA who would otherwise want to. Students are often more comfortable and confident when in their own element on the school's campus.

48. Second, meeting outside of school hours is often all but impossible for young student-athletes trying to balance school, sports, church, and family obligations.

49. And third, most, if not all, successful student groups rely on adults to help provide logistical support and continuity, given the obviously high turnover that student groups face as students graduate each year. Many of the most successful student clubs on campuses—including science groups and academic groups such as the National Honor Society—depend heavily on adult involvement and even leadership. For instance, it is not uncommon for National Honor Society chapters to be led by the same school faculty for many years.

50. Even aside from these important logistical considerations, however, a crucial point of FCA's religious mission is to be on campus. FCA's student leaders *want* to meet with fellow students and adult volunteers on campus so they can model to fellow students and coaches what it looks like to follow Christ *in* their school communities—something they cannot do if they're forced to meet elsewhere.

51. Having adult staff and volunteers present on campus is also critical to FCA's religious mission because it allows FCA to see how student leaders are doing and give the students invited feedback and guidance.

52. To be clear, FCA huddles on school campuses are student-led and student-initiated. FCA National and FCA New Jersey do not elect student leaders or start huddles. Rather, students are responsible for starting their own huddles and electing their own leaders. It is the student leaders who invite FCA staff and volunteers to assist them. The problem here is that student leaders in religious groups such as FCA are unable to obtain the kind of adult support that is available to all other groups.

53. As a result of the District's actions, the student leaders and members of FCA Central and FCA Timberlane have been and are being deprived of access to the spiritual guidance and support FCA's adult staff can offer when they are invited by FCA students to attend on-campus meetings. And these students are missing out on access to the spiritual example and invited feedback that adult volunteers were previously able to offer and which they seek to continue to provide.

***The District's student groups***

54. The Hopewell Valley Regional School District receives federal financial assistance to fund its operations.

55. The District allows students to create and organize their own student groups. These student groups are not required to relate to the school curriculum and are

allowed to meet on campus during noninstructional time. The District maintains a diverse array of noncurricular recognized student groups.

56. In the District, official club recognition comes with important benefits. This includes the ability to meet on campus and host school-sanctioned events during school hours; inclusion in the school activity fair where faculty sponsors and club members are visible for prospective members to see and join clubs; access to advertisement spaces on school campuses; and—most relevant here—the ability to invite outside volunteers onto campus to attend their club meetings.

57. The District's website boasts more than 80 clubs and activities at Hopewell Valley Central High School alone. *See* Hopewell Valley Central High School, *Clubs & Activities 2025-26* (last visited August 5, 2026), https://perma.cc/99J4-Y4YA. And the District has recognized all sorts of noncurricular clubs, such as the Hopewell Valley High School Robotics Team, GirlTalk, the Dungeons and Dragons Club, the Pickleball Club, the Baking Club, and the Poetry Club.

58. To allow all these student groups to thrive and best help their students, the District has long allowed community members to volunteer in its schools and mentor its students. *See* Hopewell Valley Regional School District, *Volunteer Handbook* 6, https://perma.cc/TZE8-6JUN.

59. Indeed, as the District has explained, volunteer participation is "beneficial to everyone involved" because "students benefit from the knowledge,

personalization, and caring role models that volunteers provide" and volunteers "help students achieve and succeed." *Id.* at 3, 5. And these "positive interactions" make "all members of the community flourish." *Id.* at 5.

60. Given the substantial benefits that volunteers provide, many District student groups regularly invite adult visitors to attend their on-campus meetings. For example,

- The Hopewell Valley High School Robotics Team uses "adult mentors to help [its] students throughout the robotics season and in off-season developments." Their mentors come on campus to "work with students in building, designing, and programming the robot along with managing finances, sponsorships, merch, and other entrepreneurship tasks."

- The Community Connections Club "invite[s] guest speakers for monthly presentations on topics such as cultures, professions, and personal journeys."

- The Youth Environmental Society has hosted multiple "Lunch and Learn" programs in which outside visitors have led presentations for students.

- The Culture Connections Club "provid[es] students the opportunity to learn about different cultures through interactive workshops and presentations from cultural representatives within the larger community."

- GirlTalk "organizes various activities, including guest speaker sessions, workshops, and social events, to encourage open dialogue and personal growth."

- SHADES is a club whose "goal is to have [its] students, along with adult facilitators, share their experiences, develop a network, and learn from each other."
- Girls Who Program/Code invites "guest speakers to speak to the club members."

61. Each of these groups' existence and ability to regularly invite adult visitors to their on-campus meetings triggers the requirements of the Equal Access Act, 20 U.S.C. §§ 4071-74, on the District's respective campuses.

***FCA in Hopewell Valley***

62. FCA has regional organizations aimed at implementing its mission in particular geographic contexts. These regions include the Carolinas, the Great Lakes, the Mid-Atlantic, and the Midwest. *See* FCA, *Local Staff Websites*, https://perma.cc/9LJ6-STB5. Each region has a regional director. Within these regions, states and the District of Columbia are overseen by state directors. Through FCA's Mid-Atlantic Region, FCA operates locally to serve the State of New Jersey.

63. FCA has operated in New Jersey for more than 30 years, and for many years it has had a presence on the District's campuses, including at Central High School and Timberlane Middle School.

64. There are currently two FCA huddles in the District: (1) FCA Central, which has been meeting at Central High School since 2010, and (2) FCA Timberlane, which has been meeting at Timberlane Middle School since 2024. Both huddles are

student-initiated and student-led. And as with all FCA huddles, one of these huddles' primary objectives is to share with coaches and student athletes the good news that Jesus Christ offers new life to all people and to give them a greater sense of purpose in their athletics.

65. FCA Central and FCA Timberlane each meet during the lunch period at their respective schools. While FCA staff and volunteers have attended the huddle meetings at both schools—and have done so without issue for years—the students are the ones responsible for leading devotionals, prayers, and all other aspects of religious exercise.

66. For years, these huddles have invited outside volunteers, such as FCA's Area Director for Central Jersey West, Carolyn McDonough, and an FCA-approved volunteer, Ken Ridge. Carolyn is herself an alumna of Central High School, where she was also an inaugural student member and student leader of the FCA Central huddle. From that experience as a student, she has a deep, personal appreciation of FCA's value to students and, as relevant here, the significance of adult support to FCA clubs from the perspective of a student. That experience with FCA was integral inspiration for her as a student, an athlete, and now as an FCA staff member. As a member of the community around Central and Timberlane, she often crosses paths with students in FCA huddles, who express their excitement to see her and their gratitude for FCA.

67. When Carolyn and Ken attended these FCA huddles' meetings, they would provide pizza for the students to eat during lunch and would also sit and talk with them. During a meeting, after the student leaders had finished running the Bible study for that week and had broken the students out into small groups, Carolyn and Ken would float around from group to group observing and sometimes participating in a group's conversation. And Carolyn and Ken were available to answer any student's questions about life, faith, or sports. They would also observe FCA's student leaders in action and provide mentorship and feedback afterwards to encourage their continued growth.

***The District's religious club restriction***

68. On March 13, 2025, the Freedom From Religion Foundation (FFRF) sent a complaint to the District, alleging that "outside adults are being permitted to enter Timberlane Middle School to lead the school's chapter of the Fellowship of Christian Athletes." The letter further claimed that the District had been "giv[ing] outside religious representatives special access to students for the purpose of promoting religion and proselytizing students, including leading students in religious activities during school-sponsored club meetings." The letter then "ask[ed] that the District investigate and ensure that outside adults are not permitted to regularly lead, attend, or participate in student religious clubs."

69. Just eight business days later, on March 25, 2025, the District's Superintendent, Dr. Rosetta Treece, responded to FFRF through a letter sent by the District's outside counsel at the law firm of Schenck, Price, Smith & King, LLP. The letter explained to FFRF that "as a result of her investigation, Dr. Treece is directing the Timberlane Middle School Principal to immediately stop the direct involvement of any outside adults in the meetings of the Fellowship of Christian Athletes."

70. But as far as FCA is aware, no such investigation ever took place. FCA is not aware that Dr. Treece ever attended (or asked another District employee to attend) an FCA meeting to corroborate FFRF's allegation that "outside adults" were "leading" the huddle. Nor is FCA aware that Dr. Treece (or any other District employee) ever discussed these allegations with either FCA Timberlane's student leaders or FCA's local staff and volunteers.

71. In August 2025, just before the start of the next school year, FCA Area Director Carolyn submitted her Hopewell Valley Regional School District Volunteer Form, which would allow her to attend FCA meetings on the District's campuses as she had for years.

72. Soon after she did so, though, the Principal at Timberlane Middle School, Christopher Turnbull, responded to inform Carolyn that she would not be allowed on campus during the upcoming school year. That's because Dr. Treece and "district counsel" had instructed Principal Turnbull that (as Principal Turnbull put it in bolded

words) "**no outside individuals are permitted**" for "religious clubs" because "the law stipulates that the students must run them." At the same time, however, Principal Turnbull acknowledged that FCA Timberlane would still be allowed to meet "this year because students drive the meetings."

73. A few weeks later, on September 11, 2025, the Principal at Central High School, Patricia Riley, informed Carolyn and FCA Central's faculty advisor, Susan Hart, that FCA Central also would not be allowed to invite outside visitors onto campus, and for the same reason—because it is a "religious club[ ]." In announcing the policy change, Principal Riley shared that she "appreciate[d] the support" FCA's staff and volunteers had provided, and that she was "sorry … the district is required to make this change."

74. Several days later, Carolyn asked Principal Riley and Ms. Hart whether this restriction on religious clubs was "part of a policy for the school district" or whether it was "something new that ha[d] been added for this year." Ms. Hart responded that "[f]rom what [she] can see," the new rule "singles out religious groups only." She continued, saying, "I have NOT heard of there being a single concern about FCA meeting on Thursdays (and sharing, praying and providing pizza and snacks) for the past 3 years. Had there been an issue, it would have been a common courtesy to bring it to our attention." Ms. Hart concluded by expressing her "hope" that the

situation "can be remedied quickly and to the most benefit of our students and community."

75. Carolyn later contacted the District two more times, seeking clarification or a written policy (beyond merely the District's recent emails) that explained this new rule that all clubs—except for religious ones—may invite outside visitors onto campus.

76. While Carolyn never received either from the District, she was able to meet with Principal Riley on October 7, 2025. At that meeting, Principal Riley disclosed that three students in FCA Central had expressed their desire for FCA's staff and volunteers to be allowed to attend FCA's meetings. Principal Riley also confirmed that the school's Robotics Club would be allowed to continue inviting outside visitors because the Robotics Club was not religious.

77. Several weeks later, on October 13, 2025, the Hopewell Valley Board of Education (a defendant here) held a school-board meeting. During that meeting, an FCA student member and his mother asked the Board to allow FCA to host outside visitors again just as it allows every other club on District campuses to do. The student, who remains active with the FCA club for the upcoming 2026-27 school year, clarified that the FCA Central huddle is student-led, but that it had greatly appreciated the support, kindness, and insights that it had received from FCA's staff and volunteers, and that the pizza and donuts made their meetings special.

78. In response, Dr. Treece claimed that it would not be possible to do allow such access to Carolyn and Ken, or to any club that is "religious in base," because the District had been "served" with a "possible pending lawsuit from" FFRF—apparently referring to FFRF's letter. Dr. Treece stated that after receiving that letter, she had "reached out to [the] board attorney," who told her that "[i]f this is happening, you have to cease and desist immediately."

79. Two weeks later, on October 28, 2025, Dr. Treece and Principal Riley met with Carolyn and FCA's State Director, Harry Flaherty, to discuss the District's new religious-club restriction. During the meeting, FCA had clarified the factual background underlying the dispute and explained how the District's new, unwritten prohibition on outside visitors for only religious clubs violated several federal and state laws. In response, Dr. Treece simply reaffirmed that outside visitors are allowed for secular student groups but not for religious student groups. Dr. Treece stated that she had been directed to take this position by the Executive County Superintendent for Mercer County at the New Jersey Department of Education, Dr. Daryl Minus-Vincent, and by the District's outside counsel at Schenck Price.

80. After the meeting ended, Dr. Treece emailed Carolyn and Harry to provide them with a copy of FFRF's March 2025 letter. In doing so, Dr. Treece reiterated her position that "both the Board Attorney and the Executive Superintendent [had] confirmed that [the District was] out of compliance by allowing outside

advisors/volunteers to come into our schools for a *religious* club"—emphasizing the word "religious" in her email. She concluded by saying, "We value our students' involvement in FCA, and we all must ensure that we are following the expectations of the NJDOE [New Jersey Department of Education] to be able to continue sponsorship of the club."

81. On October 29, 2025, Harry sent a letter to the District and Dr. Minus-Vincent, which provided a detailed background of this dispute and the legal reasons why the District's actions were unlawful and asked the District to reconsider its ban on volunteers for religious clubs.

82. On November 10, 2025, Dr. Minus-Vincent responded to Harry, explaining that "the issues … highlighted in [his] correspondence all appear to be issues that should be addressed by the Hopewell Valley Regional School District, its Board of Education, and its attorney in the first instance." Dr. Minus-Vincent therefore refused to "participat[e] in any discussions or meetings … concerning the resolution of this issue." At no point, however, did Dr. Minus-Vincent disavow Dr. Treece's statement that he had directed her to ban all outside volunteers for religious clubs. Nor did he instruct or encourage the District, which is under his supervision, to rectify blatantly unlawful actions against students.

83. After almost three weeks had passed without hearing anything from the District, Harry again emailed Dr. Treece on November 20, 2025, asking for "a response

within the next week" given that "students' statutory and constitutional rights are currently being infringed." On November 24, 2025, Dr. Treece responded, "I am not sure what response you are referring to. I am complying to the expectations for religious clubs. The district has given our position."

84. Dr. Treece's November 24 email indicated that the District's position on the matter was settled. But in a final effort to avoid litigation, FCA's counsel sent a letter to the District and Dr. Minus-Vincent on December 19, 2025, which asked the District to reconsider its restriction on religious clubs.

85. In that letter, FCA again explained how the District's religious-club restriction violated the First Amendment and the Equal Access Act by singling out FCA as a religious club and making the students of religious clubs alone unable to host volunteers. The letter cited numerous cases demonstrating the unlawfulness of public schools' imposing special disabilities on religious student groups, including two cases that dealt with equal access for FCA itself. FCA also pointed out cases holding that the unlawfulness of denying equal access to religious groups was so clearly established that the officials responsible weren't entitled to qualified immunity.

86. On January 15, 2026, the District's counsel, Mr. Paul Green, responded, telling FCA that he would "review [FCA's] correspondence" and "be in touch in the

near future." In the end, however, and despite repeated follow-ups, Mr. Green never responded to FCA's letter.

87. Although the District has not rescinded its discriminatory restriction on religious clubs, in June 2026, Principal Riley permitted Carolyn to attend FCA Central's end-of-year huddle meeting. This permission was granted only after FCA Central's faculty advisor, Ms. Hart, advocated on FCA's behalf and explained to the principal that it was unfair to prohibit FCA from inviting outside volunteers while allowing outside volunteers affiliated with another group to come on campus around the same time. The students at the huddle were very excited to have Carolyn present at this meeting. But the attendance at this event further reinforced the relationship-building and mentorship opportunities that were lost throughout the course of the past school year.

88. This one-time exception has underlined rather than solved the problem. On July 2, 2026, Carolyn sent an email to Principal Riley asking whether, in light of the events at the end-of-year meeting, she would be able to return to campus for FCA huddles' weekly meetings in the 2026-27 school year. Principal Riley forwarded this inquiry to Dr. Treece. Dr. Treece—consistent with the approach of the District's counsel—ignored the question, requiring this lawsuit. Going into the 2026-27 school year, then, the District's express prohibition on volunteers for religious clubs

remains its last word. The District's decisionmakers have given no indication that they intend to change course.

***The District has frustrated FCA's religious mission***

89. The District's discriminatory actions have frustrated FCA's mission of reaching student-athletes and coaches and of promoting its religious beliefs, speech, and values. By denying these huddles access to FCA staff and volunteers, the District has also made it significantly more difficult for these huddles to function and accomplish their religious mission.

90. Because of the District's policy, Carolyn and other FCA volunteers have been unable to meet with FCA Central and FCA Timberlane students on campus.

91. Faced with the tight schedules of student-athletes and this new limitation on access, FCA staff have been significantly limited in their ability to continue mentorship of FCA students. FCA students have lost access to supportive adults who offer spiritual and personal examples, guidance, and encouragement. And this limitation has been especially harmful for FCA's student leaders, who have been deprived of the support, encouragement, and discipleship of FCA's staff and volunteers during the trying time in which they are taking on leadership responsibilities to lead FCA's meetings. When Carolyn has communicated with Hopewell FCA student leaders and members or crossed paths with them in the community, they have repeatedly told

her that their groups miss her and Ken and asked when the groups would be able to have them back at huddle meetings.

92. The District's actions have also caused FCA to divert resources from its core religious mission to promote its Christian values and lead students and coaches into a growing relationship with Jesus Christ. For instance, Carolyn has not only spent many hours trying to resolve the situation in Hopewell Valley but has also spent much time explaining and discussing the situation with concerned parents and students. So too for Harry. He has had to spend many hours working on matters related to the District's discrimination against FCA, including in participating in the meetings with District employees, submitting a letter requesting the District to reconsider its discriminatory policy, and handling numerous phone calls and meetings with his staff and superiors dealing with the fallout and harm of discrimination. Carolyn and Harry would have otherwise spent this time on other ministry-advancing tasks, such as supporting other student huddles, training new staff, raising financial resources, developing relationships with coaches in the community, engaging in one-on-one personal religious ministry activities such as prayer and religious teaching, or preparing to support other FCA ministry objectives.

93. FCA has also diverted resources by working with attorneys to help draft their final letter requesting reconsideration. This frustration of mission and diversion

of time and other resources continue to harm FCA as the District continues to discriminate against FCA.

94. The District's actions have injured FCA's student members. Because of those actions, FCA's student members have been unable to benefit from significant support from FCA staff, have lost many opportunities for further spiritual and logistical support, and have been deprived of mentoring from spiritual leaders in their community who share their devotion to faith and athletics.

95. If given the opportunity, the FCA huddles within the District would invite FCA staff and volunteers to attend on-campus huddle meetings again.

***The upcoming 2026-27 school year***

96. In the upcoming academic year, FCA won't have equal access to the benefits available to all other student groups. The District refuses to let FCA invite volunteers to its group meetings—just as every other student group can do. And it imposes this restriction expressly because FCA is a religious group. This unlawful discrimination continues to harm FCA and Hopewell students.

97. Thus, without judicial intervention, FCA's student groups within the District cannot enjoy their constitutional and statutory rights. As soon as the District's discriminatory restriction is removed, however, FCA Central and FCA Timberlane will immediately resume their years-long practice of inviting FCA staff and volunteers to their huddle meetings.

## CLAIMS FOR RELIEF

### Count I
### 42 U.S.C. § 1983
### Violation of the First Amendment to the U.S. Constitution
### Discrimination Based on Religious Status

98. Plaintiffs incorporate by reference all preceding paragraphs.

99. The Free Exercise Clause of the First Amendment states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I.

100. The Free Exercise Clause applies to states and their subdivisions and municipalities through the Fourteenth Amendment to the U.S. Constitution.

101. The Free Exercise Clause "protects religious observers against unequal treatment" and "against laws that impose special disabilities on the basis of religious status." *Trinity Lutheran*, 582 U.S. at 458, 461 (cleaned up).

102. Under this protection, when the government "disqualif[ies] otherwise eligible recipients" from receiving a benefit "'solely because of their religious character,'" status, or exercise, it "imposes 'a penalty on the free exercise of religion that triggers the most exacting scrutiny.'" *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 475 (2020); *Carson v. Makin*, 596 U.S. 767, 779, 789 (2022).

103. Such an exclusion—one "that hinge[s] solely on religious status"—is "odious to our Constitution." *Espinoza*, 591 U.S. 476-78 (quoting *Trinity Lutheran*, 582 U.S. at 467).

104. The District's policy facially violates this rule: It expressly imposes special disabilities based on religious status.

105. The District generally permits student groups to regularly meet with outside visitors.

106. And the District expressly recognizes that this is a "benefit" for students: "[S]tudents benefit from the knowledge, personalization, and caring role models that volunteers provide" and volunteers "help [the District's] students achieve and succeed." Volunteer Handbook, *supra* ¶58, at 5.

107. But the District has expressly forbidden one and only type of student group from availing itself of this benefit: "religious clubs."

108. Thus, while other student groups can—and in practice frequently do—host outside visitors, FCA and its affiliated student groups within the District are excluded from that same important benefit based on their religious status, character, and exercise.

109. Indeed, they are excluded for the sole and express reason that they have a status of "religious." As District officials have admitted, this policy "singles out religious groups only."

110. "If [the Supreme Court's] cases ... make one thing clear, it is that such a policy imposes" an at least presumptively unlawful "penalty on the free exercise of religion." *Trinity Lutheran*, 582 U.S. at 462.

111. "[A] law targeting religious beliefs as such is never permissible." *Id.* at 466 n.4 (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993)).

112. At minimum, the District's discrimination is unconstitutional unless it meets a "stringent standard": It must be the narrowly tailored in support of compelling government interests. *Espinoza*, 591 U.S. at 484-85. The District has no compelling—or even legitimate—interest in categorically prohibiting religious groups like FCA from meeting with volunteers on the same terms as all other student groups within the District solely because they are religious.

113. And any interest Defendants might assert would be fatally undermined by Defendants' willingness to permit other student groups to host outside visitors.

114. In any event, categorically excluding religious groups like FCA from meeting with volunteers is not the least restrictive means of furthering Defendants' interests.

115. Defendants are persons within the meaning of 42 U.S.C. § 1983.

116. Plaintiffs seek on behalf of themselves and their members a declaration that the District's actions violate the Free Exercise Clause and injunctive relief prohibiting future acts in violation of the Free Exercise Clause. Without such declaratory and injunctive relief, Plaintiffs and their members will continue to be irreparably harmed.

117. Plaintiffs further seek on behalf of themselves and their members compensatory damages, nominal damages, punitive damages, attorney fees, and costs of suit.

**Count II**
**42 U.S.C. § 1983**
**Violation of the First Amendment to the U.S. Constitution**
**Free Exercise Clause – Not Neutral or Generally Applicable**

118. Plaintiffs incorporate by reference all preceding paragraphs.

119. "[L]aws burdening religious practice must be" neutral and "of general applicability." *Lukumi*, 508 U.S. at 542; *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 685 (9th Cir. 2023) (en banc).

120. A law is not neutral if its "object … is to infringe upon or restrict practices because of their religious motivation." *Lukumi*, 508 U.S. at 533.

121. A law is not generally applicable if it "treat[s] *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021); *see also Fulton v. City of Philadelphia*, 593 U.S. 522, 533-34 (2021).

122. When a law or policy is not neutral or not generally applicable, that "trigger[s] strict scrutiny." *Tandon*, 593 U.S. at 62.

123. "A government policy can survive strict scrutiny only if it advances 'interests of the highest order' and is narrowly tailored to achieve those interests." *Fulton*, 593 U.S. at 541.

124. The District's policy violates this rule: it burdens religious practice under a policy that is not neutral and generally applicable.

125. Plaintiffs exercise their religion through huddle meetings in which they study the Bible, pray, support one another in their journeys of faith and athletics, and worship together—while supported by adult FCA volunteers. The volunteers play an important role in this religious practice, providing voluntary spiritual guidance to FCA students who request it, mentoring them to assist them in being bold in their faith, and—when asked—praying for them.

126. Yet Defendants have burdened this practice by entirely prohibiting it.

127. And they have done so pursuant to a policy specifically prohibiting "religious clubs" from hosting "outside individuals." That policy is not neutral and generally applicable.

128. It is not neutral because it is a prohibition that explicitly turns on a group's "religious" status, character, and exercise.

129. And it is not generally applicable because the District continues to allow secular student groups to engage in precisely analogous conduct—hosting adult visitors at their on-campus meetings.

130. Defendants maintain a policy that generally allows student clubs and organizations to invite, host, and benefit from adult volunteers, mentors, speakers, and other outside guests in connection with their activities.

131. Consistent with the District's policy, many clubs and student organizations routinely host outside volunteers at their on-campus meetings without issue.

132. By prohibiting religious groups like FCA from hosting outside visitors, the District treats secular activity more favorably than religious exercise.

133. Defendants do not have a compelling government interest, or even a legitimate one, pursued by narrowly tailored means, to justify this unequal treatment of Plaintiffs' religious exercise.

134. Defendants' unequal treatment of Plaintiffs' religious exercise violates the Free Exercise Clause of the First Amendment to the United States Constitution.

135. Defendants are persons within the meaning of 42 U.S.C. § 1983.

136. Plaintiffs seek on behalf of themselves and their members a declaration that the District's actions violate the Free Exercise Clause and injunctive relief prohibiting future acts in violation of the Free Exercise Clause. Without such declaratory and injunctive relief, Plaintiffs and their members will continue to be irreparably harmed.

137. Plaintiffs further seek on behalf of themselves and their members compensatory damages, nominal damages, punitive damages, attorney fees, and costs of suit.

## Count III
## 20 U.S.C. § 4071
## Violation of the Equal Access Act

138. Plaintiffs incorporate by reference all preceding paragraphs.

139. The Equal Access Act, 20 U.S.C. §§ 4071-4074, makes it unlawful for "any public secondary school which receives Federal financial assistance and which has

a limited open forum to deny equal access or a fair opportunity to, or discriminate against, any students who wish to conduct a meeting within that limited open forum on the basis of the religious, political, philosophical, or other content of the speech at such meetings." 20 U.S.C. § 4071(a).

140. Central is a public secondary school that receives federal financial assistance and is within Defendants' jurisdiction and control.

141. Timberlane is a public secondary school that receives federal financial assistance and is within Defendants' jurisdiction and control.

142. Both Central and Timberlane allow and have allowed noncurriculum-related student groups to meet on campus during noninstructional time.

143. Defendants thereby maintain a limited open forum as that term is defined within the EAA, triggering the statute's protections. 20 U.S.C. § 4071(b).

144. Defendants have denied Plaintiffs equal access to and a fair opportunity in this forum, and they have discriminated against Plaintiffs, based on the fact that FCA is a religious group whose meetings include religious content.

145. When a school's "limited open forum includes nonstudent participation, then nonstudent participation must be permitted for all such student groups, subject only to reasonable, nondiscriminatory regulation." *Student Coal. for Peace v. Lower Merion Sch. Dist. Bd. of Sch. Dirs.*, 776 F.2d 431, 442 (3d Cir. 1985).

146. FCA and its affiliated clubs are "student group[s] wishing to invite nonstudents onto school property" at a school with a limited open forum that "encompasses nonstudent participation." *Id.* They therefore "are protected by the [Equal Access Act]" and "enable[d] … to use those facilities on the same terms as all other students." *Id.*

147. Yet Defendants have denied FCA that right, expressly prohibiting FCA groups from hosting nonstudent volunteers solely because they are a religious club—one that engages in Bible study, discussion of faith, and prayer at its meetings.

148. Defendants have discriminated against Plaintiffs because of their religious status, exercise, and speech, and denied equal access to the limited open forum by abridging their right to invite and host adult volunteers.

149. Other secular clubs—such as the Robotics Club, Spectrum Club, YES Club, and more—continue to host adult volunteers.

150. Defendants denied Plaintiffs' rights to do likewise because of the "religious" content of the club's speech, in direct contravention of the Equal Access Act's prohibition on "discriminat[ing] against … students … on the basis of the religious … content of the speech" at their meetings. 20 U.S.C. § 4071(a).

151. Plaintiffs' meetings do not in any way threaten order and discipline on school premises or student or faculty well-being. And attendance at their meetings is voluntary.

152. Plaintiffs seek on behalf of themselves and their members a declaration that the District's actions violate the Equal Access Act and injunctive relief prohibiting future acts in violation of the Equal Access Act. Without such declaratory and injunctive relief, Plaintiffs and their members will continue to be irreparably harmed.

153. Plaintiffs further seek on behalf of themselves and their members compensatory damages, nominal damages, punitive damages, attorney fees, and costs of suit.

**Count IV**
**42 U.S.C. § 1983**
**Violation of the First Amendment to the U.S. Constitution**
**Free Speech Clause – Expressive Association**

154. Plaintiffs incorporate by reference all preceding paragraphs.

155. "The First Amendment guarantees all Americans the rights to speak, worship, publish, assemble, and petition their government freely." *First Choice Women's Res. Ctrs., Inc. v. Davenport*, 146 S. Ct. 1114, 1122 (2026).

156. It has been "long understood" that "[e]ach of these rights … necessarily carries with it 'a corresponding right to associate with others.'" *Id.* (quoting *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021)).

157. The government violates this freedom of association when it "den[ies] benefits to an organization based on its message, or punish[es] individuals for their affiliations." *Id.*; *see also Christian Legal Soc'y v. Walker*, 453 F.3d 853, 861 (7th Cir. 2006) (cannot discriminate against a group by "impos[ing] penalties or withhold[ing] benefits from individuals because" they associate for religious reasons).

158. Plaintiffs are expressive associations. They engage in expression and expressive activities together. Their activities and organization are a witness of their members' faith and thus inherently expressive.

159. Defendants' actions burden Plaintiffs' expression. Compelling Plaintiffs to abandon the religious purpose of their organization to enjoy the same privileges and opportunities as other student organizations would run contrary to the expressive purposes for which they were created and operate. And denying equal access to adult volunteers harms the expression of the associations, undermines their ability to fully function, and threatens the existence of the school-based associations.

160. Defendants allow other recognized student groups to host adult visitors and mentors. Thus, Defendants are discriminating against Plaintiffs.

161. Compelling Plaintiffs to abandon their club's religious association in order to enjoy equal benefits is not narrowly tailored to a compelling governmental interest. Nor is denying Plaintiffs the ability to have equal access to adult volunteers.

162. Defendants' actions thus violate the right of expressive association as secured by the First Amendment of the United States Constitution to Plaintiffs and their members.

163. Defendants are persons within the meaning of 42 U.S.C. § 1983.

164. Plaintiffs seek on behalf of themselves and their members a declaration that the District's actions violate the Free Speech Clause and injunctive relief prohibiting

future acts in violation of the Free Speech Clause. Without such declaratory and injunctive relief, Plaintiffs and their members will continue to be irreparably harmed.

165. Plaintiffs further seek on behalf of themselves and their members compensatory damages, nominal damages, punitive damages, attorney fees, and costs of suit.

**Count V**
**42 U.S.C. § 1983**
**Violation of the First Amendment to the U.S. Constitution**
**Assembly**

166. Plaintiffs incorporate by reference all preceding paragraphs.

167. The First Amendment protects the "right of the people peaceably to assemble." U.S. Const. amend. I. This right is independent of the First Amendment's other protections for religious exercise and speech.

168. Plaintiffs' student members seek to peaceably assemble with FCA staff and other volunteers in order to exercise their religion and worship together.

169. That right is being infringed without justification. The District has expressly and directly prohibited this peaceable assembly by barring religious clubs from hosting outside visitors at their meetings.

170. By prohibiting FCA student groups from hosting outside visitors at their meetings, the District infringes on FCA's First Amendment right peaceably to assemble to engage in otherwise lawful religious worship and speech activities with others. *See Thomas v. Collins*, 323 U.S. 516, 532-40 (1945).

171. Defendants are persons within the meaning of 42 U.S.C. § 1983.

172. Plaintiffs seek on behalf of themselves and their members a declaration that the District's actions violate the Assembly Clause and injunctive relief prohibiting future acts in violation of the Assembly Clause. Without such declaratory and injunctive relief, Plaintiffs and their members will continue to be irreparably harmed.

173. Plaintiffs further seek on behalf of themselves and their members compensatory damages, nominal damages, punitive damages, attorney fees, and costs of suit.

**Count VI**
**42 U.S.C. § 1983**
**Violation of First Amendment to the U.S. Constitution**
**Free Speech**

174. Plaintiffs incorporate by reference all preceding paragraphs.

175. Defendants' policy forbidding "religious clubs" from hosting outside volunteers is content-based and viewpoint-based discrimination in violation of the Free Speech Clause of the First Amendment, and that prohibition cannot satisfy strict (or any other level of) scrutiny.

176. Defendants have permitted other student groups to meet and host adult visitors, thus creating a limited public forum for such expression.

177. Yet they have forbidden "religious clubs" like FCA from hosting adult visitors, solely because they are religious.

178. FCA seeks to host adult volunteers in order to further its religious mission, which entails religious expression—discussing faith, engaging in Bible studies,

ministering to students, and leading student-athletes into a growing relationship with Jesus Christ and His church.

179. Clubs with a secular viewpoint are allowed to host adult visitors. But clubs with a religious viewpoint like FCA are not.

180. Forbidding religious viewpoints as a matter of policy is viewpoint discrimination. *See Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 110-11 (2001) ("quintessentially religious" views cannot be excluded by claiming to forbid religion as a subject matter); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 831 (1995) ("Religion may be a vast area of inquiry, but it also provides, as it did here, a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered."); *see also Ne. Pa. Freethought Soc'y v. Cnty. of Lackawanna Transit Sys.*, 938 F.3d 424, 437 (3d Cir. 2019) ("Religion is not only a subject. It's a worldview through which believers see countless issues.").

181. Defendants' policy allows student clubs to host outside volunteers in order to express secular messages, but forbids religious clubs from hosting outside volunteers in order to express their religious messages.

182. Defendants have violated the First Amendment by impermissibly engaging in content-based and viewpoint discrimination.

183. Defendants are persons within the meaning of 42 U.S.C. § 1983.

184. Plaintiffs seek on behalf of themselves and their members a declaration that the District's actions violate the Free Speech Clause and injunctive relief prohibiting future acts in violation of the Free Speech Clause. Without such declaratory and injunctive relief, Plaintiffs and their members will continue to be irreparably harmed.

185. Plaintiffs further seek on behalf of themselves and their members compensatory damages, nominal damages, punitive damages, attorney fees, and costs of suit.

**Count VII**
**42 U.S.C. § 1983**
**Violation of Fourteenth Amendment to the U.S. Constitution**
**Equal Protection**

186. Plaintiffs incorporate by reference all preceding paragraphs.

187. The Equal Protection Clause prohibits discrimination on the basis of religion.

188. The District has cited Plaintiff's status as a religious organization as the sole reason why FCA may not host outside visitors, while other, non-religious clubs may.

189. This amounts to discrimination on the basis of religion and is prohibited under the Equal Protection Clause.

190. Defendants' actions are not narrowly tailored to any compelling governmental interest.

191. Defendants are persons within the meaning of 42 U.S.C. § 1983.

192. Plaintiffs seek on behalf of themselves and their members a declaration that the District's actions violate the Equal Protection Clause and injunctive relief

prohibiting future acts in violation of the Equal Protection Clause. Without such declaratory and injunctive relief, Plaintiffs and their members will continue to be irreparably harmed.

193. Plaintiffs further seek on behalf of themselves and their members compensatory damages, nominal damages, punitive damages, attorney fees, and costs of suit.

**Count VIII**
**42 U.S.C. § 1983**
**Violation of First Amendment**
**Discriminatory Denial of Equal Access to Faculty Participation**

194. Plaintiffs incorporate by reference all preceding paragraphs.

195. In addition to hosting outside FCA staff and volunteers—and to mitigate some of the harms caused by the District's prohibition on those visitors—Plaintiffs desire to exercise and express their religion by inviting school faculty members supportive of FCA to participate in their meetings.

196. FCA, after all, is a ministry for students *and coaches*. Many coaches and faculty members within the District support FCA; benefit from its ministry; and can provide FCA students with additional beneficial mentoring, spiritual and logistical support, and leadership development from an adult that is already a member of their school and athletic community. FCA would like to reach out to coaches who would desire to be a part of FCA's ministry to offer them the opportunity to help provide spiritual support and examples to FCA's student members.

197. But the District has prohibited this, too. The District prohibits its staff members from attending FCA meetings in anything other than a custodial capacity, and specifically prohibits them from participating in FCA students' activities of Bible study, prayer, and spiritual discussion.

198. On information and belief, however, District staff members are permitted to, and do, participate in the activities undertaken at other student groups' meetings.

199. Like the District's explicit prohibition on "religious clubs" from hosting outside volunteers, then, this prohibition is targeted only at religious groups.

200. It therefore violates the First Amendment multiple times over.

201. Prohibiting District staff members from voluntarily participating in FCA meetings in their personal capacity burdens Plaintiffs' religious exercise by way of a policy that is not neutral and generally applicable, in violation of the Free Exercise Clause. It denies a benefit to and penalizes FCA based on the religious nature of its association, violating the First Amendment's protection for expressive association. And it directly burdens Plaintiffs' religious speech by preventing FCA students and District staff members from participating together in FCA's speech activities of Bible study, prayer, and religious discussion, and exchanging ideas on these topics.

202. The District's policy of prohibiting staff participation at FCA meetings is not a narrowly tailored means for furthering any compelling governmental interest.

203. Defendants are persons within the meaning of 42 U.S.C. § 1983.

204. Plaintiffs seek on behalf of themselves and their members a declaration that the District's actions violate the First Amendment and injunctive relief prohibiting future acts in violation of the First Amendment. Without such declaratory and injunctive relief, Plaintiffs and their members will continue to be irreparably harmed.

205. Plaintiffs further seek on behalf of themselves and their members compensatory damages, nominal damages, punitive damages, attorney fees, and costs of suit.

**Count IX**
**N.J.S.A. 10:5-1 et. seq.**
**Violation of the New Jersey Law Against Discrimination**

206. Plaintiffs incorporate by reference all preceding paragraphs.

207. The New Jersey Law Against Discrimination (LAD) ensures that "[a]ll persons shall have the opportunity to … obtain all the accommodations, advantages, facilities, and privileges of any place of public accommodation … without discrimination because of … creed." N.J. Stat. Ann. § 10:5-4.

208. The LAD also makes it "unlawful discrimination" (a) "for any person, whether an employer or an employee or not, to aid, abet, incite, compel, or coerce the doing of any of the acts forbidden under [the LAD], or to attempt to do so" or (b) "for any owner, lessee, proprietor, manager, superintendent, agent, or employee of any place of public accommodation, directly or indirectly, to refuse, withhold from, or deny to any person any of the accommodations, advantages, facilities, or

privileges thereof, or to discriminate against any person in the furnishing thereof." N.J. Stat. Ann. § 10:5-12(e)-(f).

209. The LAD prohibits such religious discrimination because it "threatens not only the rights and proper privileges of the inhabitants of the State but menaces the institutions and foundation of a free democratic State." N.J. Stat. Ann. § 10:5-3.

210. The Hopewell Valley Regional School District and its subsidiary schools are places of public accommodation under the LAD. N.J. Stat. Ann. § 10:5-5 ("'A place of public accommodation' shall include … any … primary and secondary school, … high school, … or any educational institution under the supervision of the State Board of Education or the Commissioner of Education of the State of New Jersey.").

211. Here, Defendants have prohibited Plaintiffs from being able to invite adult visitors on the same terms as every other student group in the District solely because Plaintiffs are religious. Defendants have therefore engaged in unlawful religious discrimination under the LAD.

212. Plaintiffs are thus entitled to money damages against all Defendants in their personal and official capacities, as pleaded.

213. Plaintiffs seek on behalf of themselves and their members a declaration that the Defendants' actions violate the LAD and injunctive relief prohibiting future acts

in violation of the LAD. Without such declaratory and injunctive relief, Plaintiffs and their members will continue to be irreparably harmed.

214. Plaintiffs further seek on behalf of themselves and their members compensatory damages, nominal damages, punitive damages, attorney fees, and costs of suit.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully request that the Court:

a. Declare that the First and Fourteenth Amendments to the United States Constitution, the Equal Access Act, and New Jersey's Law Against Discrimination require Defendants to stop prohibiting Plaintiffs from hosting outside volunteers due to Plaintiffs' religious status;

b. Declare that the First and Fourteenth Amendments to the United States Constitution, the Equal Access Act, and New Jersey's Law Against Discrimination protect Plaintiffs' right to host outside volunteers at their meetings to the same extent as other student groups;

c. Issue a preliminary and permanent injunction prohibiting Defendants from enforcing their prohibition on religious clubs' hosting outside volunteers at club meetings;

d. Issue a preliminary and permanent injunction requiring Defendants to permit Plaintiffs to host outside adult volunteers at their meetings to the same extent as other student groups;

e. Declare that the First and Fourteenth Amendments to the United States Constitution require Defendants to stop prohibiting Plaintiffs from having District staff members voluntarily participate at Plaintiffs' club meetings in their personal capacity;

f. Declare that the First and Fourteenth Amendments to the United States Constitution protect Plaintiffs' right to invite District staff members to participate in Plaintiffs' club meetings to the same extent as other student groups;

g. Award Plaintiffs compensatory, nominal, and punitive damages for the loss of their rights as protected by federal and state law;

h. Award Plaintiffs the costs of this action and reasonable attorney's fees; and

i. Award such other and further relief as the Court deems equitable and just.

**JURY DEMAND**

Plaintiffs request a trial by jury on all issues so triable.

Dated: August 11, 2026

Respectfully submitted,

/s/ *Richard C. Osborne*
Richard C. Osborne
Daniel H. Blomberg*
Joseph C. Davis*
Amanda G. Dixon*
THE BECKET FUND FOR
RELIGIOUS LIBERTY
1919 Pennsylvania Ave. N.W.,
Suite 400
Washington, DC 20006
(202) 955-0095
rosborne@becketfund.org

*Counsel for Plaintiffs*

* *pro hac vice* application forthcoming

## VERIFICATION PURSUANT TO LOCAL RULE 11.2

The undersigned hereby certifies that to the best of my knowledge, this matter is not the subject of any other action pending in any court or of a pending arbitration proceeding, nor at the present time is any other action or arbitration proceeding contemplated. I further certify that this foregoing statement is true to the best of my personal knowledge.

/s/ *Richard C. Osborne*
Richard C. Osborne
N.J. Bar No. 402232022