Richard C. Osborne
1919 Pennsylvania Ave. N.W., Ste. 400
Washington, DC 20006
(202) 955-0095
*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| FELLOWSHIP OF CHRISTIAN ATHLETES, et al.<br>*Plaintiffs*,<br>v.<br>BOARD OF EDUCATION OF THE HOPEWELL VALLEY REGIONAL SCHOOL DISTRICT, et al.<br>*Defendants*. | **Civil Action No. 3:26-cv-10163-RK-TJB**<br><br>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' APPLICATION FOR AN ORDER TO SHOW CAUSE AND MOTION FOR PRELIMINARY INJUNCTION**<br><br>**ORAL ARGUMENT REQUESTED** |

# TABLE OF CONTENTS


TABLE OF AUTHORITIES .... ii

INTRODUCTION .... 1

STATEMENT OF FACTS .... 3

LEGAL STANDARD .... 13

ARGUMENT .... 13

I. Plaintiffs are likely to succeed on the merits. .... 13

  A. The District's discrimination violates the Free Exercise Clause. .... 14

    1. The District has limited access to benefits based on religious status. .... 14

    2. The District's actions are neither neutral nor generally applicable. .... 16

    3. The District fails strict scrutiny. .... 20

  B. The District's discrimination violates the Equal Access Act. .... 24

  C. The District's discrimination violates FCA's free-speech rights. .... 29

  D. The District's discrimination violates FCA's expressive-association and assembly rights. .... 32

II. Plaintiffs satisfy the remaining preliminary-injunction factors. .... 35

  A. FCA is irreparably harmed. .... 35

  B. The public interest and balance of equities favor FCA. .... 37

CONCLUSION .... 38

CERTIFICATE OF SERVICE .... 40

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.*, 39 F.4th 95 (3d Cir. 2022) ........ 13, 37-38

*Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595 (2021) ........ 32

*Anash, Inc. v. Borough of Kingston*, — F.4th —, 2026 WL 2196426 (3d Cir. July 30, 2026) ........ 36, 38

*Bd. of Educ. of Westside Cmty. Schs. v. Mergens*, 496 U.S. 226 (1990) ........ 22, 24, 25

*Bible Club v. Placentia-Yorba Linda Sch. Dist.*, 573 F. Supp. 2d 1291 (C.D. Cal. 2008) ........ 37

*Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000) ........ 32, 33, 34

*Carson v. Makin*, 596 U.S. 767 (2022) ........ 14, 22

*Child Evangelism Fellowship v. Stafford Twp. Sch. Dist.*, 386 F.3d 514 (3d Cir. 2004) ........ 31, 32

*Christian Legal Soc'y v. Martinez*, 561 U.S. 661 (2010) ........ 29

*Christian Legal Soc'y v. Walker*, 453 F.3d 853 (7th Cir. 2006) ........ 33

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993) ........ 18, 20

*Circle Schs. v. Pappert*,
381 F.3d 172 (3d Cir. 2004) ....................................................................33, 34

*Davis v. Wigen*,
82 F.4th 204 (3d Cir. 2023) ..........................................................................18

*De Jonge v. Oregon*,
299 U.S. 353 (1937)......................................................................................34

*Donovan ex rel. Donovan v. Punxsutawney Area Sch. Bd.*,
336 F.3d 211 (3d Cir. 2003) ................................................................*passim*

*Espinoza v. Mont. Dep't of Revenue*,
591 U.S. 464 (2020)...............................................................................*passim*

*Fellowship of Christian Athletes v. District of Columbia*,
743 F. Supp. 3d 73 (D.D.C. 2024)...............................................................37

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*,
82 F.4th 664 (9th Cir. 2023) ...................................................................17, 37

*First Choice Women's Res. Ctrs., Inc. v. Davenport*,
146 S. Ct. 1114 (2026).............................................................................32, 33

*Fulton v. City of Philadelphia*,
593 U.S. 522 (2021)..................................................................14, 16, 17, 20

*Good News Club v. Milford Cent. Sch.*,
533 U.S. 98 (2001)...................................................................................30, 31

*Iancu v. Brunetti*,
588 U.S. 388 (2019)......................................................................................30

*InterVarsity Christian Fellowship/USA v. Bd. of Govs. of Wayne State Univ.*,
534 F. Supp. 3d 785 (E.D. Mich. 2021) .................................................34, 35

*Kennedy v. Bremerton Sch. Dist.*,
597 U.S. 507 (2022)..................................................................20, 21, 22, 24

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384 (1993) ........ 30

*Mahmoud v. Taylor*, 606 U.S. 522 (2025) ........ 20

*Matal v. Tam*, 582 U.S. 218 (2017) ........ 29

*Nat'l Ass'n for the Advancement of Multijurisdiction Practice v. Castille*, 799 F.3d 216 (3d Cir. 2015) ........ 34

*Ne. Pa. Freethought Soc'y v. Cnty. of Lackawanna Transit Sys.*, 938 F.3d 424 (3d Cir. 2019) ........ 29, 30, 31, 32

*Nken v. Holder*, 556 U.S. 418 (2009) ........ 37

*Pope v. E. Brunswick Bd. of Educ.*, 12 F.3d 1244 (3d Cir. 1993) ........ 26

*Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14 (2020) ........ 35-36

*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995) ........ 29, 30

*Shurtleff v. City of Boston*, 596 U.S. 243 (2022) ........ 30

*Singh v. Carter*, 168 F. Supp. 3d 216 (D.D.C. 2016) ........ 18

*Smith v. City of Atlantic City*, 138 F.4th 759 (3d. Cir. 2025) ........ *passim*

*Spivack v. City of Philadelphia*, 109 F.4th 158 (3d Cir. 2024) ........ 17

*Student Coal. for Peace v. Lower Merion Sch. Dist. Bd. of Sch. Dirs.*, 776 F.2d 431 (3d Cir. 1985) ....................25, 27, 28, 29

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023)....................21

*Tandon v. Newsom*, 593 U.S. 61 (2021)....................18, 20

*Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144 (3d Cir. 2002) ....................18, 23

*Thomas v. Collins*, 323 U.S. 516 (1945)....................35

*Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017)....................14, 15, 16

*Veterans Guardian VA Claim Consulting LLC v. Platkin*, 133 F.4th 213 (3d Cir. 2025) ....................13

**Statutes**

20 U.S.C. § 4071 *et seq*....................*passim*

**Other Authorities**

John D. Inazu, *The First Amendment's Public Forum*, 56 Wm. & Mary L. Rev. 1159 (2015) ....................35

## INTRODUCTION

Religious discrimination has no place in public schools. But that is precisely what is happening in the Hopewell Valley Regional School District. The District imposes one set of rules for secular student groups and another for the Fellowship of Christian Athletes—solely because FCA is religious. While other student groups benefit from regularly hosting adult volunteers at their meetings, the District has declared that for "religious clubs," "no outside individuals are permitted" at all. This damaging double standard is precisely the type of discrimination the Constitution and civil-rights laws forbid.

FCA is a religious ministry for student-athletes with affiliated student groups on thousands of college, high-school, and middle-school campuses across the country. Within the District, students at Timberlane Middle School (Timberlane) and Hopewell Valley Central High School (Central) have for years organized student FCA chapters, called "huddles," in which they study the Bible, pray, support one another in their journeys of faith and athletics—and eat pizza.

Although the huddles are student-initiated and student-led, they invite local FCA staff members and other adult volunteers to attend, just as many other student clubs do. FCA staff and volunteers help support and mentor students, answer questions, assist in leadership development—and generally bring the pizza.

But in 2025, the District announced a new policy categorically forbidding any "outside individuals" from attending any meetings of "religious clubs" at all. Under this policy, secular groups remain free to invite outside volunteers to their meetings, and many regularly do so—*e.g.*, the Robotics Club hosts outside volunteers to help students build their robots, the Community Connections Club hosts outside speakers for lunchtime presentations, and so on. But FCA is barred from engaging in that same practice, solely because it is a "*religious* club."

That policy flagrantly violates federal law. It violates the Free Exercise Clause because it conditions volunteer support on religious status, and it isn't neutral and generally applicable. It violates the Equal Access Act, a statute Congress passed precisely to ensure that religious clubs such as FCA can meet at public schools on the same terms as other clubs. It violates the Free Speech Clause because it facially discriminates based on a club's religious viewpoint. And it violates the First Amendment's protections for expressive association and assembly because it penalizes religious groups' association with others to express their religious message.

The 2026-27 school year is rapidly approaching, and FCA's weekly meetings will soon resume. Absent relief from this Court, FCA's huddles and students face imminent, irreparable harm every week the District deprives them of the support and mentorship of FCA volunteers. The Court should grant a preliminary injunction restoring FCA's access to volunteers on the same terms as other student groups.

## STATEMENT OF FACTS

***Fellowship of Christian Athletes.*** Founded in 1954, FCA is a Christian ministry whose chapters embrace its mission "of reaching coaches and student athletes with the good news about Jesus Christ." Declaration of Harry Flaherty ¶ 7. Today, FCA has over 20,000 student chapters, called "huddles," which meet on middle-school, high-school, and college campuses across the United States. *Id.*

Throughout FCA's 72-year existence, huddle ministry has been at the core of its religious mission. By supporting and affiliating with huddles on school campuses, FCA has been able to share the Gospel of Jesus Christ with student athletes and help them grow and mature as Christians. *Id.* ¶ 8. Without its campus presence, FCA cannot pursue its religious mission. *Id.*

All students are welcome to attend and participate in FCA events. Declaration of Carolyn McDonough ¶ 12. And all FCA huddles, including those in Hopewell Valley, are committed to treating every student with respect and dignity and to providing a safe space where FCA students can respectfully express their religious views and dialogue about them, all while warmly welcoming any student who chooses to attend or join an FCA huddle. *Id.*

FCA huddles are student-initiated and student-led, so students are indispensable to FCA's ministry. *Id.* ¶¶ 13-14; Flaherty Decl. ¶¶ 10-11. Students lead the groups' religious meetings and Bible studies; lead and participate in prayer, worship, and

religious teaching; select guest speakers and religious topics to cover during events; minister to their peers individually; plan and schedule ministry events on campus; communicate FCA's message with staff, faculty, and students at their school; and determine what kind of outreach and service activities to engage in to advance the groups' religious mission. McDonough Decl. ¶ 13; Flaherty Decl. ¶ 10. Given student leaders' central role, FCA considers them to be FCA Representatives—a designation they share with FCA's directors, officers, employees, and adult volunteer leaders. McDonough Decl. ¶ 14; Flaherty Decl. ¶ 11.

It is important for student leaders to be able to meet with FCA staff and volunteers on campus, as they "provide spiritual guidance and mentorship, answer questions, and assist in leadership development." Flaherty Decl. ¶ 15. Regularly meeting outside of school hours is all but impossible for middle-school and high-school students trying to balance school, sports, church, and family obligations. McDonough Decl. ¶ 16. Further, student leaders benefit from having adult support during FCA meetings, where mentors can observe and encourage them as they lead. *Id.* ¶¶ 16-18. "Much like in sports, where coaches need to see their players practice and play to give them feedback and coaching, FCA staff and volunteers need to see their student leaders in action to help them develop as future leaders in Christ." *Id.*

FCA staff and volunteers also benefit student members. As a Central High School alum and inaugural member of FCA at Central High (FCA Central), FCA Area

Director Carolyn McDonough directly benefited from "the opportunity to speak with and learn from spiritual leaders in [her] local community who underst[and] and [can] speak directly to the challenges faced by Christian student-athletes." *Id.* ¶ 19. And "in a world that can seem increasingly isolating for teenagers, FCA staff and volunteers are a powerful reminder that FCA students are part of a broader, global community and that they have a shared purpose that is big enough and important enough for all of us." *Id.*

In addition to their on-campus ministry, FCA huddles serve and enrich their broader communities. McDonough Decl. ¶¶ 8-9. For example, each year, the FCA huddles in Hopewell Valley participate in Operation Christmas Child—a ministry in which FCA students pack shoeboxes with Christmas gifts for children all around the world. *Id.* ¶ 9. And Hopewell's FCA students also volunteer as huddle leaders at FCA summer camps, allowing them to invest in younger students and to coach them in sports. *Id.*

Given the many ways FCA huddles benefit their school and community it came as no surprise that several school employees involved here were "sorry the district [was] required" to ban FCA huddles from inviting volunteers onto campus, Flaherty Decl. ¶ 23, and were hopeful that the situation could "be remedied quickly and to the most benefit of [the] students and community," *id.* ¶ 24.

***The District's student groups.*** The Hopewell Valley Regional School District receives federal financial assistance to fund its operations. *See* Osborne Ex. G at 8-9. The District allows students to create and organize their own student groups, which can meet during non-instructional time. *See* Osborne Exs. A & B.

These groups aren't required to serve an educational purpose, and the District has recognized scores of them with diverse purposes and viewpoints. Hopewell Valley Central High School alone recognizes more than 80 clubs and activities, which include clubs such as the Robotics Club, GirlTalk, Girls Who Program/Code, the Dungeons and Dragons Club, the Pickleball Club, the Baking Club, and the Poetry Club. *See* Osborne Ex. A at 10, 12-14.

To permit these student groups to thrive and serve students, the District has long allowed community members to volunteer in its schools and mentor its students. Indeed, as the District has explained, volunteer participation is "beneficial to everyone involved" because "students benefit from the knowledge, personalization, and caring role models that volunteers provide" and because volunteers "help [the] students achieve and succeed." Osborne Ex. F at 3, 5. And these "positive interactions" make "all members of the community flourish." *Id.* at 5.

Given the benefits provided by volunteers, many District student groups regularly invite adult volunteers to their on-campus meetings. For example, the Robotics Club uses "adult mentors to help [its] students throughout the robotics season and in off-

season developments." Osborne Ex. E at 1. Their mentors "work with students in building, designing, and programming the robot along with managing finances, sponsorships, merch, and other entrepreneurship tasks." *Id.* Many other groups, including Community Connections, GirlTalk, Girls Who Program/Code, the Culture Connections Club, and SHADES, all invite "guest speakers" or "adult facilitators" to some of or all their group meetings. Osborne Ex. A at 11-16.

***The District bans FCA from inviting volunteers.*** There are two FCA huddles that meet within the District: (1) FCA Central, which has been meeting at Central since 2010, and (2) FCA Timberlane, which has been meeting at Timberlane since 2024. Flaherty Decl. ¶ 13. These huddles had been allowed—without any issues—to invite FCA staff and volunteers to attend their on-campus meetings. *Id.* ¶ 14; *see also* Flaherty Ex. E at 4 (school official stating that "I have NOT heard of there being a single concern about FCA meeting"). Their meetings take place weekly over lunch, while other students are either eating their own lunch in the cafeteria or attending the meeting of another student group. McDonough Decl. ¶ 22.

In March 2025, the Freedom From Religion Foundation (FFRF) sent a complaint letter to the District, alleging that "outside adults [were] being permitted to enter Timberlane Middle School to lead the school's chapter of the Fellowship of Christian Athletes." Flaherty Ex. B at 1. FFRF's letter also claimed that the District had been "giv[ing] outside religious representatives special access to students for the

purpose of promoting religion and proselytizing students." *Id.* The letter then asked the District to investigate and "ensure that outside adults are not permitted to regularly lead, attend, or participate in student religious clubs." *Id.* at 2.

Just eight business days later, the District's Superintendent, Dr. Rosetta Treece, responded to FFRF and announced that "as a result of her investigation," she was "directing the Timberlane Middle School Principal to immediately stop the direct involvement of any outside adults in the meetings of the Fellowship of Christian Athletes." Flaherty Ex. C at 1. But as far as FCA is aware, no such investigation ever took place. FCA is not aware that Dr. Treece ever attended (or asked another District employee to attend) an FCA meeting to corroborate FFRF's unfounded allegations. Flaherty Decl. ¶ 20. Nor is FCA aware that Dr. Treece (or any other District employee) ever discussed these allegations with either FCA Timberlane's student leaders or FCA's local staff and volunteers. *Id.*

In August 2025, just before the start of the 2025-2026 school year, FCA's Area Director for Hopewell Valley, Carolyn McDonough, submitted her Hopewell Valley Regional School District Volunteer Form, which would have allowed her to attend FCA meetings on the District's campuses. McDonough Decl. ¶ 27. Soon after she did so, though, the Principal at Timberlane Middle School, Christopher Turnbull, responded to inform Carolyn that she would not be allowed on campus during the upcoming school year. *Id.* ¶ 28. That's because Dr. Treece and "district counsel" had

instructed Principal Turnbull that "**no outside individuals are permitted**" for "religious clubs." Flaherty Ex. D at 1 (emphasis in original). At the same time, however, Principal Turnbull acknowledged that FCA Timberlane would still be allowed to meet "this year because students drive the meetings." *Id.*

> I just spoke to our Superintendent, who received clarity from our district counsel.
>
> Regarding the religious clubs, the law stipulates that the students must run them; **no outside individuals are permitted**, and one of our staff members must supervise the club. The staff member is just there to ensure students are following our code of conduct and can not run the club. This is from our counsel.
>
> We will run the FCA at Timberlane this year because students drive the meetings and a staff member is present to supervise, but we can not have outside visitors. Unfortunately, I do not have flexibility, as this is guidance from our legal counsel.

A few weeks later, on September 11, 2025, the Principal at Central High School, Patricia Riley, informed Carolyn and FCA Central's faculty advisor, Susan Hart, that FCA Central would also not be allowed to invite outside visitors onto campus because it is a "religious club[ ]." Flaherty Ex. E at 5. When Carolyn asked Principal Riley and Ms. Hart for more clarity, Ms. Hart responded that she understood the new rule to "single[ ] out religious groups only," *id.* at 4, which Principal Riley then confirmed by explaining that the school's Robotics Club would be allowed to continue inviting outside volunteers because it was not religious, McDonough Decl. ¶ 31. Mrs. Hart also noted that she had "NOT heard of there being a single concern about FCA meeting on Thursdays (and sharing, praying and providing pizza and snacks) for the past 3 years." Flaherty Ex. E at 4.

Several weeks later, at the October 13 board meeting of the Hopewell Valley Board of Education, an FCA student and his mother asked the Board to allow FCA to host outside volunteers again. Osborne Ex. C at 1. Dr. Treece responded that this would not be possible because the District had been "served" with a "possible pending lawsuit" from FFRF, apparently referring to FFRF's letter. *Id.* Dr. Treece stated that the Board attorney told her that if outside volunteers had been allowed to attend FCA meetings, "you have to cease and desist immediately." *Id.*

Two weeks later, on October 28, Dr. Treece and Principal Riley met with Carolyn and FCA's New Jersey State Director, Harry Flaherty, to discuss the District's new religious-club restriction. Flaherty Decl. ¶ 28. FCA explained how the District's restriction violated several federal and state laws. *Id.* In response, Dr. Treece simply reaffirmed that outside visitors are allowed for secular student groups but not for religious student groups. *Id.* Dr. Treece stated that she had been directed to take this position by the Executive County Superintendent for Mercer County at the New Jersey Department of Education, Dr. Daryl Minus-Vincent, and by the District's outside counsel at Schenck Price. *Id.*

After the meeting ended, Dr. Treece emailed Carolyn and Harry to provide them a copy of FFRF's letter. *Id.* ¶ 29. In doing so, Dr. Treece reiterated her position that "both the Board Attorney and the Executive Superintendent [had] confirmed that [the District was] out of compliance by allowing outside advisors/volunteers to come

into our schools for a *religious* club." Flaherty Ex. F at 1 (emphasis in original). She concluded by saying, "We value our students' involvement in FCA, and we all must ensure that we are following the expectations of the [New Jersey Department of Education] to be able to continue sponsorship of the club." *Id.*

> the *Freedom from Religion* legal counsel. As we discussed in our meeting today, both the Board Attorney and the Executive Superintendent confirmed that we were out of compliance by allowing outside advisors/volunteers to come into our schools for a *religious* club. You will

***FCA asks the District to reconsider.*** On October 30, 2025, Harry sent a letter to the District and Dr. Minus-Vincent asking the District to reconsider its ban on outside volunteers for religious clubs. Flaherty Decl. ¶ 30; *see also* Flaherty Ex. G. On November 10, 2025, Dr. Minus-Vincent responded that he would leave this issue to "be addressed by the Hopewell Valley Regional School District, its Board of Education, and its attorney in the first instance." Flaherty Ex. H at 3. Dr. Minus-Vincent neither disavowed Dr. Treece's statement that he had directed her to ban outside volunteers for religious clubs nor instructed her to permit access.

After almost three weeks passed without hearing from the District, Harry again emailed Dr. Treece on November 20, asking for a response, given that "students' statutory and constitutional rights are currently being infringed." *Id.* at 1. On November 24, Dr. Treece responded that "[t]he district has given our position," and that she was "complying to the expectations for religious clubs"—presumably referring to Dr. Minus-Vincent's earlier instructions to her. *Id.*

FCA's counsel then sent a letter to the District and Dr. Minus-Vincent on December 19, asking them to reconsider and citing caselaw explaining how their actions violated the First Amendment and the Equal Access Act. Flaherty Decl. ¶ 33; *see also* Osborne Ex. H. On January 15, 2026, the District's counsel, Mr. Paul Green, responded, letting FCA know that he would "review [FCA's] correspondence" and "be in touch in the near future." Osborne Ex. D at 2. Despite repeated follow-ups, Mr. Green never responded to FCA's letter. Flaherty Decl. ¶ 36.

Finally, Carolyn sent an email to Dr. Treece on July 2, 2026, asking whether she'd be able to attend FCA huddle meetings in the upcoming school year. McDonough Decl. ¶¶ 34-35. Dr. Treece once again ignored her question. *Id.*

***The 2026-27 school year.*** The 2026-27 school year begins on September 1, 2026. *Id.* ¶ 40. Shortly thereafter, in mid-September, Central will hold its annual student activities fair, and the FCA huddles within the District will begin their weekly meetings immediately afterward. *Id.* Without judicial intervention, FCA and its huddles will continue being denied their constitutional and statutory rights on a weekly basis. As soon as the District is ordered to end its ban on religious clubs inviting outside volunteers to attend their student meetings, the FCA huddles will immediately resume inviting FCA staff and volunteers to their meetings. *Id.* ¶ 41.

## LEGAL STANDARD

"To determine whether a preliminary injunction should issue, a court must consider '(1) whether the movant has a reasonable possibility of success on the merits; (2) whether irreparable harm would result if the relief sought is not granted; (3) whether the relief would result in greater harm to the non-moving party, and (4) whether the relief is in the public interest.'" *Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.*, 39 F.4th 95, 102-03 (3d Cir. 2022).

"[A] 'reasonable probability' of success" means "odds that are 'significantly better than negligible but not necessarily more likely than not.'" *Veterans Guardian VA Claim Consulting LLC v. Platkin*, 133 F.4th 213, 218 (3d Cir. 2025). "And though plaintiffs usually bear the burden" on this factor, "that burden flips in First Amendment cases." *Id.* In this context, "'the government bears the burden' ... of proving that a plaintiff is unlikely to succeed." *Id.*

## ARGUMENT

### I. Plaintiffs are likely to succeed on the merits.

The District's policy of explicitly "singl[ing] out religious groups only" for disfavored treatment, Flaherty Ex. E at 4, violates multiple First Amendment and statutory protections: (1) free exercise; (2) the Equal Access Act; (3) free speech; and (4) the rights of expressive association and assembly. Plaintiffs have not only a reasonable but an overwhelming probability of success on each claim.

### A. The District's discrimination violates the Free Exercise Clause.

FCA will likely succeed under the Free Exercise Clause on two bases. First, the District's explicit "exclusion" of religious groups from an "otherwise available benefit" (support from outside volunteers) violates squarely-on-point Supreme Court precedents prohibiting precisely that. *E.g.*, *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 462 (2017). Second, the District has "burdened [FCA's] religious exercise" through non-"neutral and generally applicable" policies—policies that apply only to religious clubs while freely permitting secular student groups to seek support from outside volunteers. *See Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021). Strict scrutiny is therefore triggered, and the District will fail it.

#### 1. The District has limited access to benefits based on religious status.

In a trilogy of recent Free Exercise cases, the Supreme Court has reiterated a simple, longstanding rule: When government offers a benefit, it may not "expressly discriminate[ ] against otherwise eligible recipients by disqualifying them ... solely because of their religious character." *Trinity Lutheran*, 582 U.S. at 462; *accord Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 484 (2020) ("'repeatedly confirmed'"); *Carson v. Makin*, 596 U.S. 767, 780 (2022) ("unremarkable" and "basic" principle). "That is discrimination against religion" and it triggers "the strictest scrutiny." *Carson*, 596 U.S. at 780-81 (quoting *Espinoza*, 591 U.S. at 478).

The leading case is *Trinity Lutheran*. There, Missouri offered grants to help preschools resurface playgrounds, but it "had a policy of categorically disqualifying ... religious organizations" from accessing the grants. 582 U.S. at 453-54. This "policy impose[d] a penalty on the free exercise of religion that trigger[ed] the most exacting scrutiny." *Id.* at 462. Even when the government offers a "gratuitous benefit," the Court held, it may not "disqualify[ ]" "otherwise eligible recipients … solely because of their religious character." *Id.* at 462-63. Such discrimination "is odious to our Constitution" and "cannot stand." *Id.* at 467.

*Espinoza* is similar. There, Montana offered a tax credit supporting scholarships at private schools—except those "controlled" by religious organizations. 591 U.S. at 476. The Supreme Court held this "express religious discrimination" unlawful. *Id.* at 484. In doing so, the Court explained that "decades of precedent" "'repeatedly confirmed' the straightforward rule" that when a denial of benefits "hinge[s] solely on religious status," "we must apply strict scrutiny." *Id.* at 478, 484.

That straightforward rule makes this an easy case. The District has done exactly what these cases forbid: It made the availability of a benefit "hinge[ ] solely on religious status." *Id.* at 478. The District generally offers student groups what it describes as a "benefit": the ability to meet with and be mentored by outside volunteers on campus. Osborne Ex. F at 5. As the District explains, volunteer participation is "beneficial to everyone involved"—students get "knowledge, personalization, and

caring role models"; volunteers "help [the] students achieve and succeed"; and these "positive interactions" make "all members of the community flourish." *Id.* at 3, 5. But the District denies that same benefit to "*religious* club[s]." Flaherty Ex. F at 1 (emphasis in original). The only factor relevant to applying this policy is whether the club is "religious." And as the District's own employees have freely acknowledged, the District's policy "singles out religious groups only." Flaherty Ex. E at 4. That is exactly the kind of policy the Supreme Court's precedent condemns. *See Espinoza*, 591 U.S. at 476 ("The provision's title ... confirms that the provision singles out schools based on their religious character."); *Trinity Lutheran*, 582 U.S. at 460 (challenged policy "single[d] out the religious for disfavored treatment").

No doubt religious discrimination comes in more "dramatic" forms than depriving FCA students of on-campus meetings with outside staff and volunteers. *Cf. Trinity Lutheran*, 582 U.S. at 467 (only "consequence" was "a few extra scraped knees"). But these students are "member[s] of the [Hopewell] community too," and excluding them from an important benefit enjoyed by secular-student-group peers "must withstand the strictest scrutiny." *Id.* at 463.

**2. The District's actions are neither neutral nor generally applicable.**

The District's religious-club restriction also triggers strict scrutiny because it "burden[s] the religious exercise of [FCA] through policies that do not meet the requirement of being neutral and generally applicable." *Fulton*, 593 U.S. at 533. A

governmental burden on religion fails "neutrality" "when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Id.* And it flunks "general applicability" if it prohibits "religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id* at 534.

These are "bedrock requirements of the Free Exercise Clause," and if the government "transgress[es]" either it triggers "strict scrutiny." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*, 82 F.4th 664, 686 (9th Cir. 2023) (en banc); *accord Spivack v. City of Philadelphia*, 109 F.4th 158, 166 (3d Cir. 2024). The District's policy here fails both.

***Religious burden.*** At the outset, the District's discrimination "burden[s]" FCA's religious exercise of having students and volunteers gather together on campus for Bible study and prayer. *Fulton*, 593 U.S. at 533. This religious exercise includes the attendance of FCA staff and volunteers at huddle meetings, where staff and volunteers can answer questions about life in faith and sports, provide religious guidance and feedback on students' religious leadership, and pray with and for students when asked. McDonough Decl. ¶¶ 13, 18-19. But the District's policy flatly bars that practice: under the policy, "**no outside individuals are permitted**" for "religious clubs." Flaherty Ex. D at 1 (emphasis in original). "There can hardly be a more substantial

burden on a religious practice or exercise than its outright prohibition." *Davis v. Wigen*, 82 F.4th 204, 212 (3d Cir. 2023).

Blatant discrimination itself is likewise a burden. *Singh v. Carter*, 168 F. Supp. 3d 216, 230 (D.D.C. 2016) (being "singl[ed] out for special scrutiny" is "unfair and discriminatory" and "amounts to a 'substantial burden'"); *cf. Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 170 (3d Cir. 2002) ("when government discriminates against religious conduct" the burden need not be "substantial"). So Plaintiffs plainly surmount the "burden" requirement.

***Neutrality***. A rule "is not neutral" if its "object ... is to infringe upon or restrict practices because of their religious motivation." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993). The "Free Exercise Clause ... extends beyond facial discrimination" and "'forbids" even 'subtle departures from neutrality." *Id.* at 534. But there is nothing subtle about the non-neutrality here: The District's policy facially targets "religious clubs." Flaherty Ex. D at 1. Indeed, school officials confirmed that the District's policy "singles out religious groups only." Flaherty Ex. E at 4. Because "the minimum requirement of neutrality is that a law not discriminate on its face," this alone triggers strict scrutiny. *Lukumi*, 508 U.S. at 533.

***General Applicability***. A policy is not generally applicable when the government treats "*any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021); *see also Smith v. City of Atlantic City*, 138

F.4th 759, 770 (3d. Cir. 2025). Here, the District allows (and even encourages) adult volunteer participation at secular student clubs' on-campus meetings, while prohibiting that same conduct for religious clubs. *See* Osborne Ex. F at 3; *see also supra* p.7. And numerous secular clubs in fact avail themselves of this permission and have regularly invited outside adult volunteers to their on-campus meetings.

For example, the Robotics Club uses "adult mentors to help [its] students throughout the robotics season and in off-season developments." Osborne Ex. E at 1. Their mentors come on campus to "work with students in building, designing, and programming the robot along with managing finances, sponsorships, merch, and other entrepreneurship tasks." *Id.* The Community Connections Club "invite[s] guest speakers for monthly presentations on topics such as cultures, professions, and personal journeys." Osborne Ex. A at 11. SHADES (a "club for black students") exists to allow its "students, along with adult facilitators, [to] share their experiences ... and learn from each other." *Id.* at 14-15. And GirlTalk "organizes various activities, including guest speaker sessions, workshops, and social events, to encourage open dialogue and personal growth." *Id.* at 13.

Central even has a student group called Athletes Supporting Athletes, which exists to "help student-athletes find motivation and to provide support to stay in the game." *Id.* at 10. That is what FCA does, too—but because FCA helps student-athletes find motivation and support through *faith*, it is barred from hosting outside

volunteers, while Athletes Supporting Athletes is not. It is hard to imagine a clearer example, "real or hypothetical," *Smith*, 138 F.4th at 770, of a government banning religious activity while permitting "comparable secular activity," *Tandon*, 593 U.S. at 62. Because the District's policy turns on "the particular reasons for a [student group's] conduct," that "destroys general applicability" and "[s]trict scrutiny is the appropriate standard." *Smith*, 138 F.4th at 770-72.

**3. The District fails strict scrutiny.**

Having triggered strict scrutiny, the District fails that stringent test. Strict scrutiny means "the burden shifts to the District" to show "its restrictions on the plaintiff's protected rights serve a compelling interest and are narrowly tailored to that end." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 531-32 (2022). This "standard 'is not watered down'; it 'really means what it says.'" *Tandon*, 593 U.S. at 65 (quoting *Lukumi*, 508 U.S. at 546).

To satisfy it, the District's policy must serve an "interest[ ] of the highest order." *Fulton*, 593 U.S. at 541. And the policy must be "necessary to serve that interest." *Mahmoud v. Taylor*, 606 U.S. 522, 566 (2025). "[S]o long as the government can achieve its interests in a manner that does not burden religion, it must do so." *Fulton*, 593 U.S. at 541. Here, the District's blatant religious discrimination flunks that test.

***Discrimination.*** Here, the District cannot show a compelling interest in denying FCA equal access. Indeed, the only interest the District offered to justify its religious

discrimination against FCA was that "the law stipulates" that result, Flaherty Ex. D at 1, and the District must "comply[ ] to the expectations for religious clubs," Flaherty Ex. H at 1. But the District has never told FCA exactly which "law" or "expectation[ ]" it is referring to. These evasive rationales therefore aren't even "sufficiently coherent for purposes of strict scrutiny," much less compelling. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 214 (2023).

***Establishment Clause.*** To explain Defendants' actions, Defendant Treece vaguely alluded to the FFRF letter, Osborne Ex. C at 1-2, which cited Establishment Clause precedent in claiming that "[a] public school may not give outside religious representatives special access to students for the purpose of promoting religion," including by "leading students in religious activities," Flaherty Ex. B at 1; *see also* Flaherty Exhibit E at 3 (suggesting the FFRF letter as the source of the policy).

But even assuming the District can claim the letter's theory as its own after having not actually articulated it itself, *but see Kennedy*, 597 U.S. at 543 n.8 ("Government 'justification[s]' for interfering with First Amendment rights" can't be "invented *post hoc*'"), the theory is wrong. Its main trouble is that the "evidence cannot sustain it." *Id.* at 536. FCA wasn't enjoying "special access to students"; it was being afforded *equal* access. The "Establishment Clause is not offended when religious observers and organizations benefit from neutral government programs." *Espinoza*,

591 U.S. at 474. Nor can the District assert an "interest in separating church and state 'more fiercely' than the" Establishment Clause requires; such an interest "'cannot qualify as compelling'" and "does not justify enactments that exclude some members of the community from an otherwise generally available public benefit because of their religious exercise." *Carson*, 596 U.S. at 781 (quoting *Espinoza*, 591 U.S. at 484-85). Or as the Third Circuit has put it in another student group case, a "school has no valid Establishment Clause interest" in denying religious students "an equal opportunity" to participate in the "broad range of student activities" permitted to other groups. *Donovan ex rel. Donovan v. Punxsutawney Area Sch. Bd.*, 336 F.3d 211, 226-27 (3d Cir. 2003).

Nor was the District "coerc[ing] belief or participation in religion" by permitting FCA volunteers to join students for voluntary meetings involving religious content. Flaherty Ex. B at 1. As the Supreme Court "has long recognized," "'secondary school students are mature enough ... to understand that a school does not endorse,' let alone coerce them to participate in, 'speech that it merely permits on a nondiscriminatory basis.'" *Kennedy*, 597 U.S. at 538-39 (quoting *Bd. of Educ. of Westside Cmty. Schs. v. Mergens*, 496 U.S. 226, 250 (1990) (plurality opinion)).

That principle plainly applies here. The District of course doesn't require anyone to join FCA or attend its meetings; students join voluntarily and the group meets during noncurricular time. McDonough Decl. ¶ 10. And the District's own

employees are aware that FCA's religious activities—prayer, Bible study, and the like—are led by *students*, not by FCA's adult volunteers. *See* Flaherty Ex. D at 1 ("students drive the meetings"). Permitting volunteers to join in those activities on the same terms as volunteers join in other student groups' voluntary activities fully comports with First Amendment values: "the 'guarantee of neutrality is respected, not offended' when religious persons benefit incidentally from 'neutral criteria and evenhanded policies.'" *Tenafly*, 309 F.3d at 177.

***Equal Access Act.*** FFRF also claimed that language in the Equal Access Act addressing "nonschool persons" meant that "the District may not allow outside adults ... to lead, organize, or regularly participate in 'student' religious clubs." Flaherty Ex. B at 1-2 (quoting 20 U.S.C. § 4071(c)(5)).

But in addition to misunderstanding the facts (FCA groups are *student*-led and *student*-organized, McDonough ¶ 21), FFRF misreads the statute. The EAA doesn't forbid religious clubs from having nonschool persons regularly attend their activities. Rather, it provides that that schools do not violate the EAA's "fair opportunity" mandate if they "*uniformly* provide[ ] that ... nonschool persons may not direct, conduct, control, or regularly attend activities of student groups." 20 U.S.C. § 4071(c), (c)(5) (emphasis added). Exactly the opposite is happening here, and that statutory language on its face offers no comfort for a school that wants to forbid nonschool persons from regularly attending the meetings of religious clubs *only*. Indeed, such

a targeted ban plainly violates the EAA's prohibitions on "deny[ing] equal access" to religious student groups and "discriminat[ing] against" them, *id.* § 4071(a)—as explained below. *Infra* Section I(B).

In any event, even if the EAA did permit schools to forbid nonschool persons from "regularly attend[ing]" the meetings of religious clubs, it *still* wouldn't justify the prohibition that the District imposed here—which forbids nonschool persons from attending any meetings of religious clubs *at all*. Flaherty Ex. F at 1. Any attempt to support the District's total ban on volunteers for religious clubs by pointing to the "regularly attend[ing]" language would thus be a simple *non sequitur*.

***

In short, the District's justification "hinges on the need to generate conflict between" FCA's rights and the Establishment Clause and EAA. *Kennedy*, 597 U.S. at 542. But no conflict exists; the Establishment Clause and EAA "violations" the District may imagine are "phantom[s]" and cannot "justify actual violations of [FCA]'s First Amendment rights." *Id.* at 543.

### B. The District's discrimination violates the Equal Access Act.

The District's religious-clubs-only volunteer ban also violates the EAA. 20 U.S.C. §§ 4071-4074. Congress enacted the EAA precisely to address "widespread discrimination against religious speech in public schools," *Mergens*, 496 U.S. at 239. In light of Congress's "broad legislative purpose," the Supreme Court has instructed

that the EAA must be given a similarly "broad reading." *Id.* And students and student groups "may maintain a private cause of action" under this statute for injunctive relief and damages. *Student Coal. for Peace v. Lower Merion Sch. Dist. Bd. of Sch. Dirs.*, 776 F.2d 431, 441 (3d Cir. 1985); *accord, e.g.*, *Donovan*, 336 F.3d at 227.

The EAA provides:

> It shall be unlawful for any public secondary school which receives Federal financial assistance and which has a limited open forum to deny equal access or a fair opportunity to, or discriminate against, any students who wish to conduct a meeting within that limited open forum on the basis of the religious, political, philosophical, or other content of the speech at such meetings.

20 U.S.C. § 4071(a).

Under the statute, then, the threshold questions are whether the case involves a "public secondary school which receives Federal financial assistance" and whether that school "has a limited open forum." *Id.* If so, then the school is forbidden from "deny[ing] equal access to," denying "a fair opportunity to," or "discriminat[ing] against" students "who wish to conduct" religious meetings on campus, *i.e.*, religious student clubs. *Id.*

Here, Central and Timberlane are public secondary schools that receive Federal financial assistance. *See, e.g.*, Osborne Ex. G at 8-9. And they also have "a limited open forum," as defined in the EAA. The statute provides that "[a] public secondary school has a limited open forum whenever such school grants an offering to or opportunity for one or more noncurriculum related student groups to meet on school

premises during noninstructional time." 20 U.S.C. § 4071(b). Here, the District permits, in its words, "[a] wide selection of extra-curricular" student groups to meet on the Central and Timberlane campuses during noninstructional time, including—just to name a few—Board Game Club, Garden Crew, GirlTalk, Key Club, Ski and Snowboard Club, P.A.N.D.A. (Preventing Alcohol 'n Drug Abuse), Pickleball Club, and Poetry Club. Osborne Ex. A at 1, 7-8, 11, 13-15; Osborne Ex. B at 25; McDonough Decl. ¶¶ 22, 25.

Groups like these are indisputably "noncurriculum related" within the meaning of the EAA, given that a group is "curriculum-related" only if its subject matter is "actually taught" "in a class." *Donovan*, 336 F.3d at 221 (quoting *Pope v. E. Brunswick Bd. of Educ.*, 12 F.3d 1244, 1251 (3d Cir. 1993)). Indeed, the Third Circuit has already "placed" some of these exact groups and kinds of groups "into the category of 'noncurriculum related student groups.'" *Id.* ("Key Club," "a ski club," and "an anti-drug and alcohol club").

Yet the District "den[ies] equal access … to" and "discriminate[s] against" religious student groups by prohibiting religious student groups—and only religious student groups—from hosting outside adult supporters at their meetings. 20 U.S.C. § 4071(a); *accord* Flaherty Ex. F at 1. That conclusion follows ineluctably both from "the plain meaning of the statutory text," *Donovan*, 336 F.3d at 221-22, and from binding Third Circuit precedent. In *Donovan*, for example, a school "violated the

EAA" when it "denied" a group "that discusses current issues from a biblical perspective" "equal access to meet on school premises during the activity period." *Id.* at 220-26. And in *Student Coalition for Peace*, the Third Circuit explained—in reasoning squarely on-point here—that under the EAA, if a school's "limited open forum includes nonstudent participation, then nonstudent participation must be permitted for all such student groups, subject only to reasonable, nondiscriminatory regulation." 776 F.2d at 442.

In *Student Coalition for Peace*, a student organization "dedicated to the cause of world peace through nuclear disarmament" sought "to invite nonstudents to" a "Peace Fair" on school grounds, but the school district denied the request. *Id.* at 433-34, 441. The district court rejected the student organization's EAA claim on the ground that the EAA doesn't require schools to permit student groups to invite "nonstudents" to "enjoy school property." *Id.* at 441-42.

But the Third Circuit disagreed, "reject[ing] the broad contention that the Act does not apply to activities involving nonstudents." *Id.* at 442. The Third Circuit explained that the EAA's "emphasis" is on "equality of terms of access"—that is, on ensuring "that religiously oriented student activities of an extracurricular nature would be allowed under the same terms and conditions as other extracurricular activities.'" *Id.* (quoting legislative history). Thus, "if the school's limited open forum encompasses nonstudent participation in student events," then all student groups

must be allowed nonstudent participation "on the same terms," *id.*—regardless of their "religious, political, philosophical, or other" character, 20 U.S.C. § 4071(a).

Just so here. The District's "limited open forum" no doubt includes "nonstudent participation." *Id.* § 4071(b). The District permits student groups to avail themselves of the "benefit[s]" of outside "volunteers." Osborne Ex. F at 5. And other student groups regularly do so—for example, the Robotics Club uses "adult mentors" who help its students build robots, Osborne Ex. E at 1; the Community Connections Club has "guest speakers for monthly presentations," Osborne Ex. A at 11; and SHADES fosters networking between students and "adult facilitators," Osborne Ex. A at 14-15.

But the District has not permitted "nonstudent participation … for all such student groups" on a "nondiscriminatory" basis. *Student Coal. for Peace*, 776 F.2d at 442. Instead, it has subjected "*religious* club[s]" to different terms—they alone are prohibited from having "outside volunteers" attend any of their meetings. Flaherty Ex. F at 1 (emphasis in original).

That violates the EAA. FCA's huddles are "student groups wishing to invite nonstudents onto school property" at schools with a forum that "encompasses nonstudent participation." *Student Coal. for Peace*, 776 F.2d at 442. They therefore "are protected by the" EAA and entitled to invite nonstudents "on the same terms as all

other students." *Id.* "Congress" has "spoke[n] very loudly," *Donovan*, 336 F.3d at 219—and it has instructed that the District's policy is unlawful.

**C. The District's discrimination violates FCA's free-speech rights.**

The District's religious-clubs-only volunteer ban also violates the Free Speech Clause. Under that Clause, when the government creates a limited public forum, "some content- and speaker-based restrictions may be allowed." *Matal v. Tam*, 582 U.S. 218, 243 (2017). But the government can never "discriminate against speech on the basis of its viewpoint," or otherwise "exclude speech where [doing so] is not 'reasonable in light of the purpose served by the forum.'" *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

Here, the District created a limited public forum for First Amendment purposes when it allowed student groups to form, gather, and invite outside volunteers. *See Christian Legal Soc'y v. Martinez*, 561 U.S. 661, 679 (2010). But it excluded FCA staff and volunteers from that limited public forum because FCA huddles engage in "religious" speech. That is "viewpoint discrimination," which is always "out of bounds." *Ne. Pa. Freethought Soc'y v. Cnty. of Lackawanna Transit Sys.*, 938 F.3d 424, 432 (3d Cir. 2019). "Even if [the policy] were viewpoint neutral," however, it would nonetheless be unreasonable "in the light of the purpose of the forum"—and thus still unconstitutional. *Id.* at 437-38.

***The District's Actions are Viewpoint-Based.*** First, the District's religious-club restriction discriminates based on viewpoint. A speech restriction discriminates based on viewpoint when its targets the "ideology or the opinion or perspective of the speaker." *Rosenberger*, 515 U.S. at 829. Viewpoint discrimination "violates the First Amendment's most basic promise." *Freethought Soc'y*, 938 F.3d at 432. And a policy that engages in it "must be invalidated." *Iancu v. Brunetti*, 588 U.S. 388, 398 (2019).

Here, the viewpoint discrimination is inescapable. As the Supreme Court and this Court have explained repeatedly, when government excludes speech from a forum in which it would "otherwise [be] permitted" on the ground that it is "religious," the policy "constitute[s] impermissible viewpoint discrimination." *Freethought Soc'y*, 938 F.3d at 432-35 (discussing, *e.g.*, *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 393 (1993), and *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 111-12 (2001)); *see also Shurtleff v. City of Boston*, 596 U.S. 243, 258 (2022) (government can never "exclude speech based on 'religious viewpoint'").

That's this case. The District created a limited public forum for student clubs. It allows adult volunteer participation and speech within this forum, recognizing that such speech (and speakers) provide the "benefit[s]" of "knowledge, personalization, and caring role models." Osborne Ex. F at 5. But it does not allow that speech for "religious clubs." Flaherty Ex. D at 1. That is viewpoint discrimination. Student

clubs that "want[ ] to offer ... religious instruction ... must have equal access to a forum that allow[s] others to speak on morals and character development," *Freethought Soc'y*, 938 F.3d at 433 (discussing *Good News Club*, 533 U.S. at 102, 108-09), as the District's forum plainly does here, *see generally* Osborne Ex. F.

Put differently, public schools cannot apply more restrictive rules to religious speech than secular speech. *See Child Evangelism Fellowship v. Stafford Twp. Sch. Dist.*, 386 F.3d 514, 528-30 (3d Cir. 2004) (Alito, J.). Nor can they impose restrictions that apply "solely because of [a student] club's religious nature." *Donovan*, 336 F.3d at 226. Because the restriction here does just that, it is facially viewpoint discriminatory, and that ends the Free Speech Clause inquiry: The district's exclusion of outside volunteers for religious clubs is invalid. *Id.*

***The District's Actions are Unreasonable.*** Further, even a merely content-based restriction must still be "reasonable 'in the light of the purpose of the forum and all the surrounding circumstances.'" *Freethought Soc'y*, 938 F.3d at 437. And the government "bears the burden of showing its restrictions are reasonable." *Id.* at 438.

But here, the only reason Defendants have asserted for the ban on adult volunteers for religious clubs is that "the law stipulates" that result and the District must "comply[ ] to the expectations for religious clubs." Flaherty Ex. D at 1; Flaherty Ex. H at 1. As explained above, however, the law stipulates no such thing, *supra* Section 1.A.3, so discrimination on that basis is not reasonable. Indeed, it is "unreasonable

to so broadly single out for exclusion speech entitled to special protection." *Free-thought Soc'y*, 938 F.3d at 441; *see also Child Evangelism Fellowship*, 386 F.3d at 530. And the District's exclusion does not otherwise serve the interests of the forum. As the District says, "positive interactions" by students with outside volunteers make "all members of the community flourish." Osborne Ex. F at 5. All Plaintiffs want is the benefit of those positive interactions for their own huddle members, which will only make the "community flourish" more and harm no one.

**D. The District's discrimination violates FCA's expressive-association and assembly rights.**

By prohibiting FCA huddles from inviting mentors to their group meetings, the District has also violated FCA's expressive-association and assembly rights.

***Expressive association.*** "The First Amendment guarantees all Americans the rights to speak, worship, publish, assemble, and petition their government freely." *First Choice Women's Res. Ctrs., Inc. v. Davenport*, 146 S. Ct. 1114, 1122 (2026). And it has been "long understood" that "[e]ach of these rights … necessarily carries with it 'a corresponding right to associate with others.'" *Id.* (quoting *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021)). "This right is crucial in preventing the majority from imposing its views on groups that would rather express other, perhaps unpopular, ideas." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647-48 (2000). The government violates this freedom of association when it "den[ies] benefits to an organization based on its message, or punish[es] individuals for their affiliations."

*First Choice*, 146 S. Ct. at 1122; *see also Christian Legal Soc'y v. Walker*, 453 F.3d 853, 861 (7th Cir. 2006) (cannot discriminate against a group by "impos[ing] penalties or withhold[ing] benefits from individuals because" they associate for religious reasons). Such "government actions ... warrant 'the closest scrutiny.'" *First Choice*, 146 S. Ct. at 1122.

Here, both FCA huddles qualify as expressive associations because they engage in expression and expressive activities together, and those expressive activities promote a core set of religious beliefs. *See Dale*, 530 U.S. at 649-50. And the District's discriminatory policy both "den[ies] benefits to" FCA's huddles "based on [their] message" and "punish[es]" FCA-associated students "for their affiliations." *First Choice*, 146 S. Ct. at 1122. If FCA's message weren't "*religious*," then these huddles would be free to meet with outside volunteers. Flaherty Ex. F at 1. And if FCA students were affiliated with some other group rather than FCA, they'd be free to reap the many "benefit[s]" that on-campus meetings with adult "volunteers provide." Osborne Ex. F at 5.

Indeed, requiring these FCA huddles to surrender their religious mission in exchange for equal access to the benefits and opportunities available to all other student groups would compel them to abandon the core expressive purpose for which they were created. *See Circle Schs. v. Pappert*, 381 F.3d 172, 182 (3d Cir. 2004) (government violates expressive-association rights when it "substantially burdens the

[group's] mission"). Denying FCA equal access to outside volunteers also harms the expression of the associations, undermines their ability to fully function, and threatens the existence of the school-based associations. *See Nat'l Ass'n for the Advancement of Multijurisdiction Practice v. Castille*, 799 F.3d 216, 224 (3d Cir. 2015) (government burdens expressive association when it "significantly affect[s] the group's ability to advocate" its message); *see also Dale*, 530 U.S. at 653 (courts must "give deference to an association's view of what would impair its expression"). Because the District's policy "infringes on [Plaintiffs'] First Amendment associational rights," it must "survive[ ] strict scrutiny," *Circle Schs.*, 381 F.3d at 182-83—which it cannot, *see supra* Section I.A.3.

***Freedom of assembly.*** Prohibiting FCA huddles from meeting with outside adult mentors also violates their right to assemble. This "right of peaceable assembly is a right cognate to those of free speech and free press and is equally fundamental." *De Jonge v. Oregon*, 299 U.S. 353, 364-65 (1937); *see also InterVarsity Christian Fellowship/USA v. Bd. of Govs. of Wayne State Univ.*, 534 F. Supp. 3d 785, 826 (E.D. Mich. 2021) ("Gatherings for expressive activity implicate rights to assemble, speak, and associate. In order to effectively express a message or associate with others, individuals must in some way assemble."). Distinct from its free-speech rights, FCA's assembly right allows its student members to meet together with FCA staff and volunteers to "foster ideas and identities in the … 'pre-expressive' moments of

group formation." John D. Inazu, *The First Amendment's Public Forum*, 56 Wm. & Mary L. Rev. 1159, 1169 (2015); *see also Thomas v. Collins*, 323 U.S. 516, 532 (1945) ("[t]he right thus to discuss, and inform people concerning" unions "is protected not only as part of free speech, but as part of free assembly").

Here too, the District has violated FCA's rights. It allows student organizations to develop and explore all sorts of interests and passions with the help and support of outside volunteers. *See, e.g.*, Osborne Ex. A. But it denied FCA huddles the substantial benefits provided by volunteers, even though their "assembly was entirely peaceable" and akin to that of other student groups, *Thomas*, 323 U.S. at 536. The District's actions thus deny FCA the equal "ability to assemble as a campus ministry," *Wayne State*, 534 F. Supp. 3d at 827, and violate the First Amendment.

## II. Plaintiffs satisfy the remaining preliminary-injunction factors.

Having established a likelihood of success, the remaining preliminary-injunction factors follow easily. FCA "will suffer irreparable harm if the injunction is denied," "granting preliminary relief will not result in even greater harm" to the District, and "the public interest favors such relief." *Smith*, 138 F.4th at 779.

### A. FCA is irreparably harmed.

Absent preliminary injunctive relief, FCA will be irreparably harmed. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Smith*, 138 F.4th at 779 (quoting *Roman Catholic*

*Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020)); *see also Anash, Inc. v. Borough of Kingston*, — F.4th —, 2026 WL 2196426, at *21 (3d Cir. July 30, 2026) ("the loss of religious freedom is itself an irreparable harm"). Here, once the 2026-27 school year begins in a matter of weeks, Plaintiffs will again suffer the loss of their First Amendment freedom to invite volunteers to huddle meetings on the same terms as all other groups. McDonough Decl. ¶¶ 35, 40-42. That "unquestionably constitutes irreparable injury." *Smith*, 138 F.4th at 779. And since FCA's huddles meet weekly, that irreparable injury will recur every week until the District's actions are enjoined.

Nor is the irreparable harm here a technicality. FCA's huddles in the District are again being denied what the District itself calls the "benefit" of "knowledge, personalization, and caring role models." Osborne Ex. F at 5. Without attending huddle meetings, FCA's staff and volunteers cannot provide mentorship and guidance to FCA's student members, since it is "all but impossible" to meet outside of school hours and since in any event they can't see "how the students' planning for activities and content actually go in practice at the student meetings." *See* McDonough Decl. ¶¶ 16-18, 38. And FCA's student leaders and members are deprived of the opportunity to receive this mentorship and guidance from "spiritual leaders in [their] local community who underst[and] and c[an] speak directly to the challenges faced by Christian student-athletes" like them. *Id.* ¶ 19.

The loss of adult mentorship and presence at FCA at the start of a school year is especially harmful, since a new year brings new students into the school community and offers an opportunity for FCA to welcome them into its group. The loss of adult mentorship and presence at FCA during this critical time is a harm that cannot be remedied at the end of litigation. *See Bible Club v. Placentia-Yorba Linda Sch. Dist.*, 573 F. Supp. 2d 1291, 1300 (C.D. Cal. 2008). Indeed, courts have often recognized the irreparable harm from violations of the First Amendment rights of religious student groups. *See, e.g.*, *FCA-San Jose*, 82 F.4th at 694-95 (high school FCA huddles' First Amendment rights); *Fellowship of Christian Athletes v. District of Columbia*, 743 F. Supp. 3d 73, 94 (D.D.C. 2024) (limitations on FCA's rights could create ongoing harm to recruitment and organizational health); *Bible Club*, 573 F. Supp. 2d at 1300 (risk of irreparable harm if Christian club was "not allowed access to the open forum at the beginning of school" and student leader deprived of "fleeting" opportunity). Absent preliminary relief, FCA will suffer irreparable injury.

**B. The public interest and balance of equities favor FCA.**

The remaining factors—public interest and balance of equities—merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). And these factors will "almost always ... favor the plaintiff" in cases like this one, given the "strong public interest in upholding the requirements of the First Amendment." *Amalgamated Transit Union Loc. 85*, 39 F.4th at 109; *see Anash, Inc.*, 2026 WL

2196426, at *21 ("the supremacy of federal law guides the public-interest analysis" and "the public interest is greatest in correcting unconstitutional practices").

Indeed, the District has not identified *any* actual harm it would incur from permitting FCA to host outside volunteers on the same terms as other student groups, instead merely invoking the mistaken notion that "the law" somehow "stipulates" that result. Flaherty Ex. D at 1. Meanwhile, by seeking this equal access, FCA simply seeks to reinstate the status quo as it existed for years before the 2025-2026 school year, and as it has existed both across New Jersey and the nation for decades. As FCA's faculty advisor at Timberlane said, there had not been "a single concern about FCA meeting on Thursday (and sharing, praying, and providing pizza and snacks) for the past 3 years." McDonough Decl. ¶ 30; Flaherty Ex. E at 4. So even if it were possible to imagine a "public interest of such weight as to deny the most fundamental of freedoms," *Smith*, 138 F.4th at 779, this case would come nowhere close.

## CONCLUSION

The Court should grant this motion and enter the preliminary injunction requested in the attached proposed order.

Dated: August 14, 2026

Respectfully submitted,

/s/ *Richard C. Osborne*
Richard C. Osborne
Daniel H. Blomberg*
Joseph C. Davis*
Amanda G. Dixon*
THE BECKET FUND FOR
RELIGIOUS LIBERTY
1919 Pennsylvania Ave. N.W.,
Ste. 400
Washington, DC 20006
(202) 955-0095
rosborne@becketfund.org

*Counsel for Plaintiffs*

* *pro hac vice application forthcoming*

## CERTIFICATE OF SERVICE

I hereby certify that on August 14, 2026, a copy of the foregoing was served on counsel for the official-capacity Defendants via email and on the personal-capacity Defendants via first-class U.S. Mail.

/s/ *Richard C. Osborne*
Richard C. Osborne