**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| FELLOWSHIP OF CHRISTIAN ATHLETES, et al.<br><br>Plaintiffs,<br><br>v.<br><br>BOARD OF EDUCATION OF THE HOPEWELL VALLEY REGIONAL SCHOOL DISTRICT, et al.<br><br>Defendant. | Civil Action No.: 3:26-cv-10163 (RK-TJB)<br><br>Motion Date: September 21, 2026 |

**Opposition to Plaintiffs' Application for an Order to Show Cause and Motion for Preliminary Injunction**

Eric I. Bueide, Esq.
Katherine A. Gilfillan, Esq.
**SCHENCK, PRICE, SMITH & KING, LLP**
220 Park Avenue, P.O. Box 991
Florham Park, New Jersey 07932
(973) 539-1000
*Attorneys for Defendants,*
*Board of Education of the Hopewell Valley Regional School District and Superintendent Dr. Rosetta D. Treece*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... ii

PRELIMINARY STATEMENT .......... 1

PROCEDURAL HISTORY .......... 2

STANDARD OF REVIEW .......... 8

LEGAL ARGUMENT .......... 10

POINT I .......... 10

PLAINTIFFS LACKS ARTICLE III STANDING FOR PROSPECTIVE INJUNCTION RELIEF .......... 10

A. Plaintiffs are unable to demonstrate a "concrete, particularized, and actual or imminent" injury traceable to Defendant's actions. .......... 11

B. Plaintiffs have not asserted any facts that establish representational standing .......... 15

C. Plaintiffs are unable to establish direct organizational standing .......... 18

POINT II .......... 22

PLAINTIFFS' HAVE FAILED TO DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS .......... 22

A. Plaintiffs are unlikely to succeed on their Equal Access Act claims as the requested relief violates the Act .......... 22

I. Plaintiffs requested relief violates the Establishment Clause and therefore Plaintiffs are unlikely to succeed on the merits of their First Amendment claims. .......... 28

II. Plaintiffs' Free Exercise, Free Speech, and Free Association/Assembly claims are unlikely to succeed because student FCA chapters have never been denied the opportunity to meet as clubs in the District .......... 30

POINT III .......... 34

PLAINTIFFS HAVE FAILED TO DEMONSTRATE IRREPARABLE HARM .......... 34

POINT IV .......... 38

THE PUBLIC INTEREST AND BALANCE OF EQUITIES FAVOR THE DISTRICT .......... 38

CONCLUSION .......... 40

# TABLE OF AUTHORITIES

## Cases

ACLU v. Black Horse Pike Regional Board of Education,
84 F.3d 1471 (3d Cir. 1996) ....................29

Allen v. Wright,
468 U.S. 737 (1984) ....................10

Associated Builders & Contractors W. Pa. v. Cmty. Coll. of Allegheny Cnty.,
81 F.4th 279 (3d Cir. 2023) ....................10

Blunt v. Lower Merion School District,
767 F.3d 247 (2014) .................... 15, 19

Citibank, N.A. v. Citytrust,
756 F.2d 273 (2d Cir. 1985) ....................35

City of Los Angeles v. Lyons,
461 U.S. 95 (1983) ....................11

Clapper v. Amnesty Int'l USA,
568 U.S. 398 (2013) ....................11

Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.,
108 F.4th 194 (3d Cir. 2024) ....................9, 10

Fair Employment Council v. BMC Mktg. Corp.,
28 F.3d 1268, 307 U.S. App. D.C. 401 (D.C. Cir. 1994) ....................19

Finkelman v. NFL,
810 F.3d 187 (3d Cir. 2016) ....................11

Free Speech Coal., Inc. v. Paxton,
606 U.S. 461 (2025) .................... i, 30, 32

Havens Realty Corp. v. Coleman,
455 U.S. 363 (1982) ....................19

Hohe v. Casey,
868 F.2d 69 (3d Cir. 1989) ....................35

In re Arthur Treacher's Franchisee Litigation,
689 F.2d at 1143 ....................38

La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest,
624 F.3d 1083 (9th Cir. 2010) ....................19

Lanin v. Borough of Tenafly,
515 F. Appx 114 (3d Cir. 2013) .................... 9, 35, 36

Lujan v. Defenders of Wildlife,
504 U.S. 555 (1992) .................... 16, 18

Mallet & Co. v. Lacayo,
16 F.4th 364 (3d Cir. 2021) ....................8

Messina v. College of New Jersey,
566 F.Supp.3d 236 (D.N.J. 2021).................... 35, 36

Murthy v. Missouri,
603 U.S. 43 (2024) ....................11

Nken v. Holder,
556 U.S. 418 (2009) ....................38

NutraSweet Co. v. Vit-Mar Enters., Inc.,
176 F.3d 151 (3d Cir. 1999) ....................9

Orson, Inc. v. Miramax Film Corp.,
836 F. Supp. 309 (E.D. Pa. 1993)....................36

Pharmacia Corp. v. Alcon Labs., Inc.,
201 F.Supp.2d 335, 383....................36

Reading v. North Hanover Twp.,
124 F.4th 189, (3d Cir. 2024).................... 10, 11

Reilly v. City of Harrisburg,
790 Fed. Appx. 468 (3d Cir. 2019) ....................9

Roman Catholic Diocese v. Cuomo
592 U.S. 14 (2020) ....................37

Santa Fe Independent School District v. Doe,
530 U.S. 290, 311 (2000) ....................29

Smith v. City of Atlantic City
138 F.4th 759 (3d Cir. 2025) ....................37

Student Coalition for Peace v. Lower Merion School District Board of School Directors,
776 F. 3d 431 (3d Cir. 1985) .................... 26, 27, 28, 34

Summers v. Earth Island Institute,
555 U.S. 488 (2009) .................... 10, 16

Susan B. Anthony List v. Driehaus,
573 U.S. 149 (2014) ....................11

Tandon v. Newsom,
593 U.S. 61 (2021) ....................32

TransUnion LLC v. Ramirez,
594 U.S. 413 (2021) .................... 10, 11, 21

Trinity Lutheran Church of Columbia, Inc. v. Comer
582 U.S. 449 (2017) ....................31

Turner Broadcasting System, Inc. v. FCC,
512 U.S. 622 (1994) ....................32

United States v. Texas,
599 U.S. 670, 143 S. Ct. 1964, 216 L. Ed. 2d 264 (2023) ....................10

**Statutes**

20 U.S.C. § 4071(c) .................... 23, 27

20 U.S.C. § 4071(c)(5) ....................23

**Rules**

N.J.A.C. 6A:7-1.1(a) ....................4

**Constitutional Provisions**

U.S. Const. art. III, § 2 ....................10

# PRELIMINARY STATEMENT

This is not a matter, as Plaintiffs claim, of religious discrimination within New Jersey's public schools. This is a matter where two adults, with no affiliation to the Hopewell Valley Regional School District (the "District"), seek exceptional access to students, during the school day, to promote their religious message; access that no other outside, non-affiliated individuals are permitted.

Plaintiffs, who are neither parents of any enrolled student nor District staff members, seek to continue their regular weekly attendance at student club meetings of the Fellowship of Christian Athletes ("FCA") at Central High School ("CHS") and Timberlane Middle School ("TMS"). What they seek is not equal access; it is *special* access that violates both the Equal Access Act (the "Act") and the Establishment Clause of the First Amendment to the United States Constitution.

In resolving Plaintiffs' preliminary injunction motion, the Court is presented with three issues, all of which are dispositive in the Defendants' favor:

- **No Standing for Injunctive Relief.** Plaintiffs lack standing to pursue the instant relief as they have failed to identify a single FCA student member who will suffer imminent harm if relief is not granted; nor have they established that FCA's resources will be diverted or its mission frustrated on a *going forward basis*.

- **No Likelihood of Success on the Merits**. Under the Act, non-school affiliated persons may not direct, conduct, control, or regularly attend activities of student groups. Here, Plaintiffs seek relief that would require two non-District affiliated adults to regularly attend weekly student FCA meetings throughout the school year. This relief cannot be squared with the Act's requirements.

- **No Clear Showing of Immediate Irreparable Injury**. FCA is a national organization ("FCA-national"), seeking to assert claims under the Act on its own behalf. However, FCA-student clubs continue to operate unimpeded in the District. Students still attend club meetings during the school day at the same non-instructional time. As such, there is no irreparable injury that will befall any student as they are being provided with the same ability to meet, congregate, pray and discuss their beliefs as other student groups. Further, Plaintiffs' delay in bringing this action and this motion exposes FCA-national's actions for what they are; an attempt to advance a political agenda via the public schools of New Jersey rather than by seeking change through the appropriate channels.

## PROCEDURAL HISTORY

Plaintiffs filed the underlying complaint on August 11, 2026, at which time it was assigned to the Honorable Robert Kirsch, U.S.D.J. The complaint was served on the Defendants on August 13, 2026. On August 14, 2026, Plaintiffs interposed the instant order to show cause as to why a preliminary injunction

should not issue granting Plaintiffs immediate and seemingly unregulated weekly access to District students.

## STATEMENT OF FACTS

Defendant, Board of Education of the Hopewell Valley Regional School District ("the Board"), sets policy and oversees the fiscal and educational operation of the District. The District educates approximately 3,400 students ranging from pre-kindergarten through twelfth grade, from three neighboring communities. The District consists of four elementary schools, Timberlane Middle School ("TMS"), and Hopewell Valley Central High School ("CHS"). Certification of Dr. Rosetta Treece (hereinafter "Treece Cert."), ¶4.

At TMS and CHS, the District offers students the opportunity to participate in various sports, extracurricular clubs, co-curricular activities as well as non-school-sponsored clubs. Certification of Patricia Riley (hereinafter "Riley Cert."), ¶6. Certain extracurricular clubs, sports and activities are "recognized" by the District, via the assignment of monetary stipends through the Board's collectively bargained agreement with the Hopewell Valley Educational Association. Treece Cert., ¶ 5. Students are permitted to organize other types of clubs provided there is demonstrated interest and a certificated staff member has agreed to supervise the club without compensation. Id.

Board Policy 5842, "Equal Access of Student Organizations," ("the Policy")

addresses the formation of the latter type of student club. Treece Cert., Exhibit D. Pursuant to the Policy, the Board permits the use of school facilities by student-initiated organizations for non-curricular student activities. Id. Under the Policy, a student-initiated organization, "regardless of the size of the group, will not be denied an opportunity to meet and use school facilities on the basis of any of the protected categories listed at N.J.A.C. 6A:7-1.1(a) [including religion, among other protected categories] or the political, philosophical, or other content of the speech at their meeting." Id. Student organizations who wish to meet on school premises must seek their building principal's permission which is contingent upon the student organization complying with the following requirements:

1. The activity has been initiated by students;
2. Attendance at the meeting is voluntary;
3. The meeting is for a lawful purpose;
4. The meeting does not materially and substantially interfere with the orderly conduct of instructional activities in the school;
5. Non-school persons do not direct, conduct, control, or regularly attend the activity; and
6. The activity is adequately supervised by appropriately certificated District staff.

Id.

FCA has operated student clubs at CHS and TMS in Hopewell since 2009 and 2024, respectively. See Treece Cert., ¶7; Riley Cert., ¶3. Each club meets

weekly during its school's lunch period; TMS students meet on Wednesdays and CHS students meet on Thursdays. Certification of Christopher Turnbull (hereinafter "Turnbull Cert."), ¶5; Riley Cert., ¶3.

On or about March 13, 2025, the District's Superintendent, Rosetta D. Treece, received correspondence from the Freedom From Religion Foundation ("FFRF"), indicating that a District community member had registered a complaint that outside adults were being permitted to regularly attend, and potentially leading FCA meetings at TMS. Treece Cert., ¶8, Exhibit B. Such attendance is in violation of the Policy.

After consulting with the Board Solicitor, Dr. Treece uncovered that non-District affiliated adults were regularly attending the weekly FCA-student meetings in violation of the Equal Access Act and the First Amendment's Establishment Clause. Treece Cert. at ¶9. In fact, one of the adults, Carolyn McDonough had apparently been regularly attending FCA meetings at CHS for years. Riley Cert., ¶4. Neither Ms. McDonough nor Ken Ridge, the other FCA-national affiliated adult, who was also regularly attending weekly FCA meetings, are associated with the District in any capacity. Nevertheless, these individuals attended these club meetings every Wednesday and Thursday during the 2024-2025 school year until the situation was brought to the attention of the Superintendent. Riley Cert. at ¶¶8-9; Turnbull Cert. at ¶9; Treece Cert. at ¶10.

Upon uncovering the presence of these individuals regularly at FCA meetings, Dr. Treece advised the principals that this type of attendance was not permitted. This information was, in turn, relayed to faculty supervisors of the respective FCA clubs to ensure that the District was in compliance with its own Policy and the Act. Treece Cert., ¶11; Riley Cert., ¶¶10-12; Turnbull Cert., ¶11.

FCA clubs continued to run at TMS and CHS without the regular attendance of Ms. McDonough or Mr. Ridge, through the end of the 2024-2025 school year and without any further objection or complaint from the FCA adults. Treece Cert. at ¶13.

At the beginning of the 2025-2026 school year, Ms. McDonough sought "clarification" from one of the principals as to why she and Mr. Ridge were no longer permitted to attend every FCA meeting. She was again advised that regular attendance at FCA meetings was impermissible based upon the District's understanding of the limitations of the Act. Id. at ¶14.

This is not to say, however, that Ms. McDonough and Mr. Ridge were completely barred from the District's premises as they would have this Court believe. Visitors' logs for the remainder of the 2024-2025 and the 2025-2026 school year[1] reflect that both individuals made occasional visits to FCA meetings

[1] FCA clubs at TMS and CHS continued to meet weekly during the 2025-2026 school year, without McDonough or Ridge's regular attendance. Treece Cert. at ¶ 26-27; Riley Cert. at ¶ 15; Turnbull Cert. at ¶ 15-17.

after the District enforced its existing policy barring "regular attendance" in March 2025. See Turnbull Cert. at ¶12; Riley Cert. at ¶¶18-20.

Shortly after the commencement of the 2025-2026 school year and again after asking for "clarification" of the District's policy, Ms. McDonough asked Dr. Treece to meet with her and other FCA employees in an effort to have the District reconsider their request for regular and repeated access to the student FCA groups. Clearly, as will be made evident *infra*, this was nothing more than a poorly veiled attempt to cloak FCA-national's delay in challenging this action and to attempt to create standing where it simply does not exist. The meeting was scheduled to take place on October 25, 2025. Treece Cert. at ¶15.

On or about Thursday, October 9, 2025, a teaching staff member provided Principal Riley with a copy of a flyer that was found in a CHS hallway, following a regularly scheduled student FCA meeting. Riley Cert. at ¶17. The flyer contained a script which was apparently to be read by students at an upcoming Board meeting scheduled for October 13, 2025. Treece Cert. at ¶16. That flyer contained the following asterisked statement at the bottom of the script: "**Important note: Students SHOULD NOT say anything about Carolyn [McDonough] LEADING at all in the club or in prayer, etc.**" [Emphasis added] Id., Exhibit C. At the October 13, 2025 Board meeting, a student read the aforementioned

statement verbatim excepting the final line quoted above. Id. at ¶ 17.

The October 25, 2025 meeting proceeded as scheduled, and was attended by Dr. Treece, Principal Riley, Ms. McDonough, Mr. Ridge and FCA employee Harry Flaherty. Dr. Treece reiterated that FCA adult representatives, as "non-school persons", were not allowed to regularly attend the FCA meetings as they had done in the past. Dr. Treece also reinforced that student FCA clubs had been meeting, and would continue to meet, unimpeded, during their lunch periods each week. Treece Cert. at ¶18. This meeting was the last substantive discussion between the parties.

TMS and CHS host several other noncurricular, student-led clubs which are subject to the Policy. While some of these other student clubs, which include among them a Jewish student group, have occasionally hosted outside visitors during their meetings, none have ever sought to have outside adults regularly attend or lead their meetings. Treece Cert. at ¶20.

FCA groups at both TMS and CHS will run as planned during the 2026-2027 school year. Treece Cert. at ¶26.

## STANDARD OF REVIEW

Preliminary injunctive relief is an "extraordinary remedy, which should be granted only in limited circumstances." Mallet & Co. v. Lacayo, 16 F.4th 364, 391 (3d Cir. 2021) (internal citation omitted). At this stage, the function of the court

is *not* to take whatever steps are necessary to prevent irreparable harm, but rather to maintain the status quo until the court is able to determine the parties' respective legal rights. Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec., 108 F.4th 194, 200 (3d Cir. 2024) (emphasis in original, internal citation omitted).

In order to demonstrate entitlement to such an extraordinary remedy, a plaintiff must demonstrate: "(1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured … if relief is not granted." Reilly v. City of Harrisburg, 790 Fed. Appx. 468 (3d Cir. 2019) (internal citation omitted). If these two "threshold" factors are met, a court then considers the remaining two factors – (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest and determines, on balance, whether to grant the requested preliminary relief. Id. The party seeking preliminary injunctive relief must meet all four factors and "failure to establish any element in [the movant's] favor renders a preliminary injunction inappropriate." NutraSweet Co. v. Vit-Mar Enters., Inc., 176 F.3d 151, 153 (3d Cir. 1999); see also Lanin v. Borough of Tenafly, 515 F. Appx 114, 117 (3d Cir. 2013) ("All four factors must favor preliminary relief.").

Even when the merits of a case involve a constitutional claim, the grant of such relief is not prescribed because the Court must still weigh the other factors.

Del. State Sportsmen's Ass'n, 108 F.4th at 197 (emphasis in original).

## LEGAL ARGUMENT
## POINT I

### PLAINTIFFS LACKS ARTICLE III STANDING FOR PROSPECTIVE INJUNCTION RELIEF

"Before considering the prerequisites for a preliminary injunction, we turn to jurisdiction." Reading v. North Hanover Twp., 124 F.4th 189,196 (3d Cir. 2024).

Article III standing is a "bedrock constitutional requirement that [the Supreme Court] has applied to all manner of important disputes." United States v. Texas, 599 U.S. 670, 675, 143 S. Ct. 1964, 216 L. Ed. 2d 264 (2023) The jurisdiction of the federal courts extends only to "Cases" and "Controversies." U.S. Const. art. III, § 2. And "[u]nder Article III, a case or controversy can exist only if a plaintiff has standing to sue." Id., *quoting* Associated Builders & Contractors W. Pa. v. Cmty. Coll. of Allegheny Cnty., 81 F.4th 279, 286 (3d Cir. 2023). Federal courts do not operate as an open forum for citizens "to press general complaints about the way in which government goes about its business." Allen v. Wright, 468 U.S. 737, 760 (1984). "To obtain a judicial determination of what the governing law is, a plaintiff must have 'a personal stake' in the dispute. TransUnion LLC v. Ramirez, 594 U.S. 413, 423 (2021), Summers v. Earth Island Institute, 555 U.S. 488, 493 (2009) (These requirements help ensure that the plaintiff has "such a personal stake in the outcome of the controversy" as to warrant invocation of

federal-court jurisdiction.) (internal quotation marks omitted).

To establish Article III standing, a plaintiff bears the burden of showing that: it has suffered, or will suffer, an injury that is: (1) "concrete, particularized, and actual or imminent"; (2) "fairly traceable to the challenged action"; and (3) "redressable by a favorable ruling." Id., *quoting* Murthy v. Missouri, 603 U.S. 43, 57 (2024). Because standing is an indispensable part of the plaintiff's case, the plaintiff must satisfy these requirements "for each form of relief that [it] seek[s]." Murthy, *quoting* TransUnion LLC, 594 U.S. at 431.

Where, as here, plaintiff seeks prospective relief to address future harm, it must show that "the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." Reading v. North Hanover Twp., 124 F.4th at 196, *quoting* Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158 (2014). "Allegations of possible future injury are not sufficient." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409 (2013). City of Los Angeles v. Lyons, 461 U.S. 95, 102-03 (1983) ("[P]ast wrongs do not in themselves amount to [a] real and immediate threat of injury," unless accompanied by "continuing, present adverse effects.")

**A. Plaintiffs are unable to demonstrate a "concrete, particularized, and actual or imminent" injury traceable to Defendant's actions.**

To be "concrete," an injury must be "real, or distinct and palpable, as opposed to merely abstract." Finkelman v. NFL, 810 F.3d 187, 193 (3d Cir. 2016).

To be sufficiently "particularized," the injury must "affect the plaintiff in a personal and individual way." Id. A "chain of contingencies" or "mere speculation" is insufficient to establish an injury-in-fact. Id.

Although Plaintiff has raised several claims alleging that the District is violating the First Amendment rights of its student-chapter members, Plaintiff has failed to name any individual students as parties to this dispute. The underlying complaint and supporting declarations conspicuously lack any reference to, much less evidence that, any *students* who participate in the FCA chapters at either CHS or TMS have suffered, or are likely to suffer, a "concrete, particularized, and actual or imminent" injury as a result of the District appropriately applying its existing Policy. Indeed, District students' rights under the Act have been wholly and decisively honored and thus have been unaffected by the District's decision to enforce the Policy.

By its own admission, FCA is a nationwide Christian ministry whose mission is to "[reach] coaches and student athletes with the good news about Jesus Christ." Declaration of Harry Flaherty, ¶¶5-7 (hereinafter "Flaherty Decl."). Thus, Plaintiffs' supposed injury is that the District's policy "undermine[s] FCA's religious mission if FCA's student leaders [do not] receive the proper spiritual and leadership training." According to Plaintiff, in order for these student leaders to have such proper spiritual and leadership training, it is "vital" for FCA employees

to be able to directly provide "in the moment" "spiritual guidance and leadership development" on school campuses Id. at ¶¶ 10, 12, 16; see also Declaration of Carolyn McDonough at ¶16 (hereinafter "McDonough Decl.") as it is "all but impossible" for FCA employees to meet with students anywhere besides school, or at any time other than regular school hours, because middle and high school students are "trying to balance school, sports, church, and family obligations." Flaherty Decl. at ¶16.

Putting aside for the moment that FCA-national apparently believes that it should not be subject to the same scheduling obstacles that plague almost every middle or high school parent, FCA-national fails to allege, much less demonstrate, any nexus between an inability to provide "spiritual guidance" to students specifically during the school day to the "undermining" of their mission. Moreover, FCA-national has failed to demonstrate that this inability to provide "spiritual guidance" has resulted in a concrete, particularized or actual injury to any of FCA's student members. Further, Plaintiff's argument completely ignores the fact that what FCA-national seeks is exactly what the Act and the Establishment Clause prohibit, the proselytizing of students in the State's public school system. The District's policy mirrors the language of the Act and thus supports the separation of church and state as embodied in the Establishment Clause. Thus the harm claimed by Plaintiff is not action traceable to the District; it

is action required of the District by an act of Congress and the Constitution itself. The harm alleged by FCA-national is a harm that can only be remedied by a change in law, nay – in a change to this Country's Constitution.

To the extent that FCA-national's argument can be read to assert a harm against District students, again they fail to identify any individual by name, initials or pseudonym. Moreover, they fail to enunciate whatever that harm may be. This Court should not be asked to engage in conjecture of the potential harm to befall some unknown potential plaintiff, particularly on a motion for a preliminary injunction.

The undisputed record here reflects that FCA student meetings, at both CHS and TMS, have continued weekly, uninterrupted, following the District's limitation in March 2025 of the regular attendance at these meetings by FCA-national volunteers. See Treece Cert. at ¶26-27. FCA students have been free to "engage in Bible studies; … participate in prayer, worship, and religious teaching; … minister to their peers individually; plan and schedule ministry events on campus;" and "communicate FCA's Christian message when interacting with administrators, staff, faculty, and students at their school." See Flaherty Decl. at ¶10. The only "change" has been to FCA-national's special access to students; access that should have never occurred in the first instance.

FCA-national offers no allegation, much less evidence, that any lack of

"spiritual guidance and leadership development" provided by FCA employees on a weekly basis, has harmed either FCA-national or FCA students in some legally cognizable manner. Assuming *arguendo*, that FCA-national was able to offer such evidence of harm, this is not a harm remedied by violating the proscriptions of the Establishment Clause of the Constitution. FCA-national, and their supporters, must advocate for a change in law in Washington; not attempt to undermine the current law within New Jersey's public schools, particularly on a motion for injunctive relief.

**B. Plaintiffs have not asserted any facts that establish representational standing**

The complaint in this matter purportedly identifies two student FCA clubs. To the extent Plaintiffs assert standing through these student clubs, in the absence of individual student-plaintiffs, the claim lacks merit.

Where an organization asserts standing on behalf of its members, it is claiming it has "representational standing." In order to establish this form of standing, plaintiff must demonstrate: "(1) the organization's members have standing to sue on their own; (2) the interests the organization seeks to protect are germane to its purpose; and (3) neither the claim asserted nor the relief requested requires individual participation by its members." Blunt v. Lower Merion School District, 767 F.3d 247, 279 (2014). All three prongs must be met in order to establish standing. Id.

Standing is particularly difficult to show where third parties, rather than the plaintiff, are the object of the Government action or inaction to which plaintiffs object. Lujan v. Defenders of Wildlife, 504 U.S. 555, 559-562 (1992). To satisfy the first prong, the plaintiff organization must "make specific allegations establishing that at least *one identified member* had suffered or would suffer harm." Id., *quoting* Summers v. Earth Island Inst., 555 U.S. at 498 (emphasis added).

Lujan involved a challenge to a rule promulgated by the Secretary of the Interior ("Secretary") interpreting the Endangered Species Act of 1973 ("ESA"). Specifically, in 1978, the Secretary promulgated a regulation stating that the obligations imposed by the ESA extended to all actions taken by Federal agencies in foreign nations. The next year, the Secretary rolled back that regulation, determining that the requisite consultation between Federal agencies only applied to actions taken in the United States. The respondents, Defenders of Wildlife, filed the action seeking, among other relief, an injunction that would require the Secretary to restore the initial interpretation. The Supreme Court set a high bar for establishing standing under this theory, noting that where a "plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else, much more is needed" to establish standing. Id. at 562.

The Court's focus shifted to the purported injury and whether the causation

and redressability prongs had been met. In consideration of whether "actual or imminent" injury had demonstrated, the Court recognized that respondents' plans to "someday" participate in an activity of observing wildlife in the future, did not support the type of injury necessary for standing. Id. at 564-565.

FCA-national appears to believe that the FCA students, whose First Amendment rights they claim to champion, are incapable of exercising and expressing their own religious beliefs unless outside adults are present at their meetings (which again constitutes a violation of the Act). FCA-national has submitted no evidence that any FCA student has or had any concrete plan or firm intention to invite FCA-national employees to any club meeting during the 2026-2027 school year. While one might infer from Plaintiffs' papers that FCA-national *wants* its employees to regularly attend meetings during the 2026-2027 school year, there is no evidence to even suggest that any District student has made any request that would be thwarted by the District's policy. In fact, after clarifying and enforcing the terms of Policy 5842 to apply uniformly to all student-initiated club activities, the District honored Ms. McDonough's request to attend end-of-year meetings.

Again, no students have been identified by name or initials and FCA-national fails to allege that any harm has or will befall any student, named or unnamed, should an injunction not issue. Indeed, no such harm can be established

because these students have enjoyed, consistent with their constitutional rights, the ability to assemble, to pray and to exercise their religion to same extent that other students get to assemble and discuss their thoughts, ideas, beliefs and aspirations.

The Lujan Court expounded upon the standing of "strangers" who do not ordinarily possess a right of action under a promulgated rule/statute:

> To say that the Act protects ecosystems is not to say that the Act creates (if it were possible) rights of action in persons who have not been injured in fact, that is, persons who use portions of an ecosystem not perceptively affected by the unlawful action in question.

504 U.S. at 566.

As FCA-national cannot establish any harm or injury to any District student under the Act, it focuses on the "harm" incurred by two, non-District affiliated adults. To be clear, these individuals are not parents of children who attend District schools; they are not employees of the Defendant; they do not coach or participate in nor are they paid for supervision or involvement in District-recognized curricular or extra-curricular activities offered by the District. They are, for all intents and purposes, "strangers" to the District. As Plaintiffs cannot satisfy the first prong of the representational standing test, they lack standing to pursue the instant preliminary injunction motion.

**C. Plaintiffs are unable to establish direct organizational standing**

In an apparent attempt to avoid dismissal of their Complaint based upon the fact that no FCA student has been harmed by the District's actions, FCA-national

attempts to establish direct organizational standing to pursue the prospective relief it seeks. This argument also fails.

An organization may establish a "concrete and demonstrable injury" sufficient to confer standing if a defendant's actions "perceptibly impair" the organization's ability to provide services. Blunt, 767 F.3d at 285, *quoting* Havens Realty Corp. v. Coleman, 455 U.S. 363, 378-79 (1982). Organizations may not satisfy the "injury" requirement by manufacturing the injury by making expenditures solely for the purpose of litigation, nor by simply choosing to spend money fixing a problem that otherwise would not affect the organization at all. La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest, 624 F.3d 1083, 1088 (9th Cir. 2010) citing Fair Employment Council v. BMC Mktg. Corp., 28 F.3d 1268, 1276-77, 307 U.S. App. D.C. 401 (D.C. Cir. 1994). "[An organization] must instead show that it would have suffered some other injury if it had not *diverted* resources to counteracting the problem." Blunt at 285, *quoting* La Asociacion de Trabajadores, 624 F.3d 1083, 1088 (emphasis in original).

Here, Plaintiffs' claims of diverted resources are insufficient to establish standing which would allow FCA to pursue forward-looking injunctive relief. Harry Flaherty, who has never been involved in the weekly club meetings, claims that he spent "at least 50 hours" participating in meetings with District employees, submitting a letter to the District about its policy with respect to regular attendance

at student club meetings by non-school persons, and "handling numerous phone calls and meetings with my staff and superiors." Flaherty Decl. at ¶37. Based on his declaration, his last active involvement in the events that gave rise to this matter occurred on or about December 19, 2025, when he sent a letter to the District. Id. at ¶33. According to Mr. Flaherty, these activities diverted him from his normal job responsibilities of "providing supervision, guidance, and religious support to [his] field leaders" Id. at ¶38. Yet again, Plaintiff fails to allege what "supervision, guidance and religious support" could not be provided and who it could not be provided to. In fact, it appears that the tasks which Flaherty complains about are exactly in line with what his job responsibilities for FCA-national, not in addition to the jobs he performs regularly.

Similarly, Carolyn McDonough claims she spent "at least 50 hours" "trying to resolve the situation in Hopewell Valley," time which she spent "repeatedly [having] to explain and discuss the situation with concerned parents and students." McDonough Decl. at ¶37. She claims that if she was not discussing the situation with concerned parents and students, she would have been "providing ministry outreach and support to other FCA [clubs] in the Central Jersey West area." Id. Based on her declaration, her last active efforts to resolve FCA's disagreement with the District's policy were on or about October 28, 2025, when she met with Dr. Treece, the District's Superintendent. Id. at ¶32.

Mr. Flaherty's and Ms. McDonough's declarations are entirely backward looking and suggest that to the extent they ever diverted resources from their regular job responsibilities, they have not done so since the last quarter of 2025. Plaintiffs' papers are devoid of any evidence suggesting that FCA's resources will be diverted or its mission will be frustrated *going forward*. Moreover, FCA-national created the issue in Hopewell by regularly attending the FCA student meetings. To the extent that they now claim they have to expend resources to "fix" the situation, it is a situation of its own making.

FCA-national has specifically and repeatedly ignored the specific language and limitations of the Act to its prior past benefit. An organization dedicated to "leading every coach and athlete into a growing relationship with Jesus Christ and His church" through campus ministries clearly understands, or should understand, the laws under which its member clubs operate. FCA-national failed to abide by these rules initially. To attempt and claim organizational standing by manufacturing divestures to "remedy" a scenario that should never had existed in the first instance, is exactly the type of "manufactured harm" that does not support standing.

"[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." TransUnion LLC v. Ramirez, 594

U.S. at 431. The question before the Court with respect to the pending motion is whether Plaintiff has made a clear showing that FCA-national's resources will be diverted or its mission will be frustrated *going forward*. The answer to that question is "no." Even assuming *arguendo* that past diversion of resources and past frustration of FCA's mission could be viewed as establishing standing for some of the claims in their underlying complaint, such divestures do not support standing for prospective relief. Accordingly, Plaintiffs preliminary injunction motion should be denied due to lack of standing.

## POINT II

## PLAINTIFFS' HAVE FAILED TO DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS

Plaintiffs claim they are victims of religious discrimination. But what they seek – to have two non-District affiliated adults regularly attend weekly FCA meetings at CHS and TMS – is not equal access; it is *special* access that violates both the Equal Access Act ("the Act") and the Establishment Clause of the First Amendment to the United States Constitution.

### A. Plaintiffs are unlikely to succeed on their Equal Access Act claims as the requested relief violates the Act

The Act makes it "unlawful for any public secondary school which receives Federal financial assistance and which has a limited open forum to deny equal access or a fair opportunity to, or discriminate against, any *students* who wish to

conduct a meeting within that limited open forum on the basis of the religious, political, philosophical, or other content of the speech at such meetings." 20 U.S.C. § 4071(a)(emphasis added).

The Act specifies five conditions under which a school will be deemed to have offered a "fair opportunity" to students who wish to conduct a meeting within its limited open forum. Most relevant to the instant matter is the requirement that the school uniformly provides that "non-school persons may not direct, conduct, control, or *regularly attend* activities of student groups." 20 U.S.C. § 4071(c)(5) emphasis added.

Here, the facts are undisputed. Board Policy 5842, which mirrors the language of the Act's "fair opportunity" provisions has been in place at all times relevant to the matter at issue herein. Treece Cert., Exhibit D. Carolyn McDonough and Ken Ridge are "non-school persons" under the Act and were attending student FCA meetings on a weekly basis during the 2024-2025 school year, a frequency which unquestionably constitutes "regular attendance" thereby violating the Act. See e.g. Riley Cert., Exhibit B; Turnbull Cert., Exhibit C.

Moreover, though "regular attendance" alone would violate the Act, Plaintiffs' own admissions about the FCA employees' roles in the ostensibly student-led meetings, raise serious questions as to whether these adults were, in fact, directing, conducting and/or controlling the meetings in violation of the Act.

For example, Ms. McDonough states that it is "essential" for student FCA members to receive "spiritual guidance from FCA's adult staff" as well as "religious training for student leaders about FCA's vision, core values, and ministry method." McDonough Decl. at ¶¶15, 16. She fails to provide any basis for why this training must be provided during school hours, other than it is otherwise inconvenient or difficult to obtain access to students before school, in the evenings or on weekends. According to McDonough, attending the meetings allows FCA's employees to "see how student leaders are doing and give them necessary feedback … like in sports, where coaches need to see their players practice and play to give them feedback and coaching." Id. at ¶18. However, Ms. McDonough is not a coach, and these meetings are not sporting events. Even coaches do not stop a game in the middle of a play to provide feedback; they speak to their players on the sidelines, during film, after practice, after games. But again, this is not a sport, it is not a co-curricular activity or even an extracurricular club. It is a student-initiated club, that Ms. McDonough unabashedly admits she and other FCA adults fully participated in.

Finally, Ms. McDonough describes what happens when she and Mr. Ridge attend meetings. Specifically, she asserts they "would float around from group to group and sometimes join a conversation" during small-group breakout sessions; and "were always available to answer any student's questions about life, faith or

sports." Id. at ¶23. Plaintiffs' own metaphor, comparing the FCA employees to coaches, gives away the game here. Would any reasonable person claim that a middle school or high school coach is not directing, conducting or controlling the practices and games of his or her team?

Accordingly, when District administrators were alerted to the full extent of these non-District affiliated persons' attendance at FCA meetings, they addressed it by prohibiting them from "regularly attending" meetings going forward, in a manner fully consistent with the Act and the First Amendment.

Though Plaintiffs claim that other non-curricular student clubs at CHS or TMS have invited outside adults to attend their meetings, the fact is that no other club has ever sought to have, nor have they had, the same "non-school person(s)" regularly attend its meetings during the school day, let alone to the extreme degree that FCA seeks here – every single meeting of a club that meets on a weekly basis. The schools' visitor logs for the 2024-2025 school year demonstrate the special access that FCA's non-school persons received. See e.g. Riley Cert., Exhibit B; Turnbull Cert., Exhibit C.

The record is also clear that Ms. McDonough was fully aware that the extent to which she was involved in the FCA meetings ran afoul of the Act. This is why a script that was prepared for student FCA members to read at a Board meeting in October 2025 – at which time the FCA employees were lobbying District

administrators to restore their previous, regular attendance at the student meetings – contained the following instruction: "Important note: Students SHOULD NOT say anything about Carolyn LEADING at all in the club or in prayer, etc." (emphasis in original). Riley Cert., Exhibit E.

Finally, the visitors' logs demonstrate that Ms. McDonough and Mr. Ridge were not completely forbidden from attending any FCA meeting as Plaintiffs claim. Despite Plaintiffs' attempts to imbue school administrators' emails containing inartful wording with the force of District policy, the record evidence establishes that during the 2024-2025 school year, after the alleged "ban" in March 2025, Ms. McDonough still attended at least six meetings. See Riley Cert., Exhibit B. During 2025-2026 school year, Ms. McDonough attended at least two FCA meetings. Riley Cert. at ¶¶18-20.

Plaintiffs argue that <u>Student Coalition for Peace v. Lower Merion School District Board of School Directors</u>, a Third Circuit case adjudicating a student organization's request to invite a nonstudent to one of its events, is "squarely on point here." 776 F.3d 431 (3d Cir. 1985). But the Court's ruling in that case does not stand for the proposition that invited non-student guests may have unfettered access to a school's limited open forum. In fact, it explicitly forbids the "regular attendance" at student activities that Plaintiffs seek here.

In <u>Student Coalition for Peace</u>, a student organization, with the stated

mission of advocating for world peace through nuclear disarmament, requested the school district's permission on two separate occasions to host a special event it called a "Peace Fair" on one of the district's athletic fields and invite nonstudents to attend the event. Id. at 433. After the first request was rejected, the student group held a Peace Fair off school grounds. Id. When the second request to hold a peace fair on a date shortly after the Act was signed into law was rejected, the student group claimed that the school district's rejection of its request violated the Act. Id. at 435.

Because the Student Coalition for Peace had expressed a desire to invite nonstudents to the Peace Fair, one of the issues before the Third Circuit on appeal was whether the Act applies to student-initiated events involving nonstudents. Id. at 438. In rejecting only "the broad contention that the Act does not apply to activities involving nonstudents" (an argument that is not before the Court in the instant matter), the Court specifically held that the "most natural reading" of 20 U.S.C. § 4071(c) was that "*if nonstudents do not direct, conduct, control, or regularly attend such meetings*, the school may be required to permit their participation." Id. at 442 (emphasis added). Based on this interpretation of the Act, the Court concluded that "student groups wishing to invite nonstudents onto school property are protected by the Act … *as long as those nonstudents do not 'direct, conduct, control, or regularly attend' such activities*." Id. (emphasis added).

Here, Plaintiffs are challenging the District's actions prohibiting FCA employees from regularly attending student FCA meetings on a weekly basis; and further (now that FCA-national has made the extent of their activities known) from directing, conducting or controlling the student meetings, just like coaches direct, conduct or control athletic team practices. Plaintiffs assert, in the most general of terms, that a handful of other student clubs at CHS invite outside adults to attend meetings, but they have not presented any evidence to indicate that any guests "regularly attend" other student-initiated club meetings during the school day. In state of fact, the CHS and TMS visitors' logs from the 2024-2025 and 2025-2026 school years disprove their speculative assertion. See Riley Cert., Exhibit B and Turnbull Cert., Exhibit C. Plaintiffs' Equal Access Act claims are thus unsupported by the plain language of the Act itself, and by the Third Circuit's ruling in Student Coalition for Peace. Accordingly, because Plaintiffs cannot demonstrate a likelihood of succeeding on the merits of their Equal Access Act claim, their motion for a preliminary injunction must be denied.

**I. Plaintiffs requested relief violates the Establishment Clause and therefore Plaintiffs are unlikely to succeed on the merits of their First Amendment claims.**

"Congress shall make no law respecting an establishment of religion." U.S. Const. Amend. I. In seeking special access for FCA employees to regularly attend student FCA meetings, Plaintiffs are effectively asking this Court to order the

District to violate the Establishment Clause.

Federal courts have consistently held that when a public school district shows favor, grants preferential access, or provides affirmative sponsorship to a religious group or religious practice, it violates the Establishment Clause. See e.g. Santa Fe Independent School District v. Doe, 530 U.S. 290, 311 (2000) (holding, notwithstanding the school district's claim that a student election as to whether to deliver prayers at high school football games meant the prayers were private speech, that the district's decision to hold the election in question had "encouraged divisiveness along religious lines in a public school setting, a result at odds with the Establishment Clause"); see also ACLU v. Black Horse Pike Regional Board of Education, 84 F.3d 1471, 1487 (3d Cir. 1996) (holding that a student vote on whether or not to include a prayer at a high school graduation ceremony violated the Establishment Clause because it would have the effect of advancing religion, and government may not favor religious belief over disbelief or adopt a preference for the dissemination of religious ideas) (internal quotation omitted).

In the instant matter, the record clearly evinces that the FCA was the only student club that invited adults unaffiliated with the District's schools to *regularly attend* its meetings, specifically during the school day. None of the District's other student clubs, including secular clubs, a Jewish student group and various political-affiliated clubs, sought to invite the same individuals to their schools, during the

school day, on a weekly basis. Again, this regular attendance by FCA-national, non-District affiliated persons violated both the District's existing Policy and the Act. In restricting Ms. McDonough and Mr. Ridge from regularly attending FCA meetings, the District was simply ensuring that all of its student clubs are, in fact, treated equally.

The Defendant requests the Court to consider the practical implications of granting a preliminary injunction without discovery. To overrule the District's action would mean not only requiring it to allow the FCA to have non-District affiliated persons regularly attend meetings but also to allow any individual associated with any other student-initiate club, meeting during the school day, to attend meetings. To do otherwise, would result in the District selectively applying its Policy in a manner that showed favor to a religious club over secular clubs and have the effect of advancing religion in violation of the Establishment Clause. To impose a preliminary injunctive ruling requiring the District to allow these individuals regular access to this club requires the District to allow all other individuals who are invited to participate in a club, regular access to those students. Such access is not required by the Act.

## II. Plaintiffs' Free Exercise, Free Speech, and Free Association/Assembly claims are unlikely to succeed because student FCA chapters have never been denied the opportunity to meet as clubs in the District

While Plaintiffs have raised various First Amendment claims, ostensibly on behalf of their student members, the fact is that the District has allowed the student members of the FCA chapters at CHS and TMS to meet on an uninterrupted weekly basis throughout the 2024-2025 and 2025-2026 school years and will continue to do so once student clubs begin to meet during the 2026-2027 school year. Treece Cert. at ¶26. Nothing has occurred which burdens the students' religious exercise, or which places restraints on or excludes these students' religious speech. Id. at ¶27. Students have not been prevented from associating with one another or assembling as a student-led and student-initiated club to engage in religious activities such as Bible study, prayer, worship and religious teaching on school grounds.

Plaintiffs' claims that the District violated the Free Exercise Clause by limiting access to "benefits" based on religious status are also without merit. Plaintiff's reliance upon Trinity Lutheran Church of Columbia, Inc. v. Comer is misplaced. 582 U.S. 449 (2017). Comer involved a Missouri state agency's determination that a church was ineligible, by virtue of being a church, to participate in a program that offered grants for the purchase of recycled playground surfaces. Here, the District is not disqualifying FCA student club members from receiving a "benefit" that it affords to other student clubs. No other student club has non-District affiliated persons regularly attend their meetings during the school

day. Restricting FCA-national affiliated adults from attending two FCA meetings a week, every week, within the District's school buildings is a neutral application of Policy 5842, consistent with the Equal Access Act.

First Amendment jurisprudence on both free exercise and free speech distinguishes between content-based policies and content-neutral policies. Governmental policy triggers strict scrutiny under the Free Exercise Clause whenever it treats any comparable secular activity more favorably than religious exercise. Tandon v. Newsom, 593 U.S. 61, 62 (2021). Conversely, content-neutral policies – policies that treat all comparable activities the same – are subject to only an intermediate level of scrutiny. Free Speech Coal., Inc. v. Paxton, 606 U.S. 461, 471 (2025), *quoting* Turner Broadcasting System, Inc. v. FCC, 512 U.S. 622, 642 (1994). Here, strict scrutiny is not remotely implicated by the District's implementation of its existing Policy to ensure that meetings of its student organizations are consistently student-initiated and student-led, and are not directed, conducted, controlled, or regularly attended by non-school persons. FCA-national bristles at being treated equally under the District's content-neutral policy because it denies their religious group more access than what the District's policy allows for all groups and simply because FCA-national previously flaunted its violation of the Act. The instant lawsuit seeks to regain the special access to which FCA-national was never entitled under either District Policy or law.

Plaintiff has failed to plead and certainly has not demonstrated that the District has burdened the FCA student club members' religious exercise. Plaintiff's novel argument is that "attendance of [non-District affiliated] by FCA staff and volunteers" at student club meetings is religious exercise; that is the religious exercise of the non-school persons, not District students. Again, FCA student members have continued their regular meeting schedule throughout the 2024-2025 and 2025-2026 school years, during which time they have been free to engage in all religious activities described in Plaintiffs' papers: Bible study, prayer, worship and religious teaching. Treece Cert. at ¶26.

By the FCA's own description, "Students are critical to FCA's religious mission. Indeed, FCA's student leaders are the primary embodiment of FCA's faith and Christian message to the campuses where they serve." McDonough Decl. at ¶ 13. How, then, is the District burdening the students' religious exercise when the students, with their student leaders present to embody FCA's faith and Christian message, have continued to meet weekly? Plaintiff essentially requests that this Court substitute FCA-national employees as students in order to establish a purported harm. This would require the Court to speculate on whether these students cannot freely exercise their Christian faith unless unaffiliated adults are there with them, in the school building, at every meeting. Such a claim strains credulity and is belied by Plaintiff's own declarations.

Plaintiff's claim that the District violated students' free speech rights by limiting FCA employees' regular attendance at student club meetings is similarly uncompelling. Students have attended FCA meetings and engaged in FCA-affiliated religious speech without any limitation. This fact alone quashes any credible argument that the District engaged in viewpoint discrimination when it informed Ms. McDonough and Mr. Ridge that they were not permitted to regularly attend FCA club meetings. As no other student-initiated club had non-affiliated adults attending their meeting regularly to begin with, it cannot be argued that the District's actions were motivated by a discriminatory animus.

As the Third Circuit observed in Student Coalition for Peace, "A school is not, of course, required to permit any and all outsiders to use its facilities, or even to permit student groups indiscriminately to invite outsiders to its activities." 776 F.2d at 442. Plaintiffs' misguided attempt to twist the Equal Access Act and First Amendment jurisprudence to require the District's schools to do just that, should be flatly denied.

## POINT III

## PLAINTIFFS HAVE FAILED TO DEMONSTRATE IRREPARABLE HARM

Neither the evidence on the record nor Plaintiffs' actions over the past year-and-a-half indicate that student FCA club members are at risk of irreparable harm if the District does not grant outside FCA-national affiliated adults regular access

to attend student meetings during the 2026-2027 school year. It is, of course, plaintiff's burden to demonstrate a "clear showing of immediate irreparable injury." Lanin v. Borough of Tenafly, 515 Fed. Appx. 114, 117 (3d Cir. 2013), quoting Hohe v. Casey, 868 F.2d 69, 72 (3d Cir. 1989).

"[P]reliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights." Lanin, 515 Fed. Appx. at 118, quoting Citibank, N.A. v. Citytrust, 756 F.2d 273, 276 (2d Cir. 1985). "Delay in seeking enforcement of those rights . . . tends to indicate at least a reduced need for such drastic, speedy action." Id.

In the Third Circuit, courts have frequently held that no irreparable harm existed where a plaintiff delayed filing a preliminary injunction motion for even just a few months. For example, in Messina v. College of New Jersey, this Court denied a current and a prospective student's request to enjoin the enforcement of the college's COVID-19 vaccine mandate. 566 F.Supp.3d 236 (D.N.J. 2021). The Court found the plaintiffs' four-month delay in filing the motion "indicate[d] a reduced need for speedy relief, created self-inflicted harm and weigh[ed] against granting injunctive relief." Id. at 249-50. Specifically, the college had issued its vaccine mandate on May 10, 2021 and the plaintiffs did not commence their action until September 27, 2021, a delay which prompted the Court to point out that the plaintiffs "could have sought a preliminary injunction months before the semester

began rather than after the semester began." Id. at 249. See also Lanin, 515 Fed.Appx. at 118 (holding that plaintiffs had not been irreparably harmed by an ordinance turning the street on which they lived into a one-way street because they did not move for a preliminary injunction for two years after the ordinance was adopted, and it "had continued to impact them in exactly the same fashion since that time); Pharmacia Corp. v. Alcon Labs., Inc., 201 F.Supp.2d 335, 383 (holding that a one year delay in moving for a preliminary injunction "knock[ed] the bottom out of any claim of immediate and irreparable harm"); Orson, Inc. v. Miramax Film Corp., 836 F. Supp. 309, 312 (E.D. Pa. 1993) ("Clearly plaintiff's own [50-day] delay in filing the motion shows that irreparable harm … is not imminent as is required for a preliminary injunction.").

There is no question that Plaintiffs' delayed action weighs against a grant of the extraordinary remedy of injunctive relief. The District's initial action in limiting Plaintiffs' regular attendance at meetings occurred in March 2025, nearly eighteen months before their complaint and this motion. Although FCA attempted to ameliorate their initial procrastination by re-engaging with the District in or around October 2025, the entirety of the 2025-2026 school year passed without a request for court intervention. In the interim, the District's application of its equal access policy "continued to impact them in exactly the same fashion." See Lanin, 515 Fed. Appx. at 118. Just like the plaintiffs in Messina, Plaintiffs could have

sought injunctive relief well over a year ago. The only reasonable conclusion to be reached for Plaintiff engaging in such a delay is that Plaintiff seeks to use this as a newsworthy opportunity to push its political and religious agenda to expand the strictures of Act. This Court should not be so swayed particularly upon a preliminary injunctive relief application.

Here, there is no threatened loss of First Amendment freedoms that warrants a presumption of irreparable harm.[2] Even if one assumes that student-FCA club members are likely to suffer some sort of injury if these adults are not permitted to regularly attend their meetings, it is impossible to conclude that the harm is "irreparable." Indeed, the evidence establishes to the contrary. These clubs continued to run throughout the 2025-2026 school year without these adults regularly attending meetings. Plaintiffs have not demonstrated that McDonough and/or Riley's absence impacted the functioning of the club or that the mission of the FCA student clubs was frustrated. Indeed, if student leaders are the primary embodiment of FCA's faith and Christian message to the campuses where they serve, and these students are, in fact, leading these "huddles," then what irreparable harm could be established if they continue to do so in the future?

[2]The cases cited by Plaintiffs are clearly distinguishable. Smith v. City of Atlantic City involved a firefighter threatened with immediate suspension. 138 F.4th 759, 769 (3d Cir. 2025). And Roman Catholic Diocese v. Cuomo involved an executive order that barred worshippers from congregating in groups of more than ten people. Both involved a direct harm to the organization's members. 592 U.S. 14 (2020). There is no such infringement here.

Accordingly, Plaintiffs motion for a preliminary injunction must be denied.

## POINT IV

## THE PUBLIC INTEREST AND BALANCE OF EQUITIES FAVOR THE DISTRICT

"[A] failure to show a likelihood of success or a failure to demonstrate irreparable injury, must necessarily result in the denial of a preliminary injunction." In re Arthur Treacher's Franchisee Litigation, 689 F.2d at 1143.

"Once an applicant satisfies the first two factors, the traditional [equitable relief] inquiry calls for assessing the harm to the opposing party and weighing the public interest." Nken v. Holder, 556 U.S. 418, 435 (2009). As Plaintiffs are unable to meet either threshold factor of the preliminary injunction standard, analysis of the other two factors is unnecessary. However, these factors also weigh in the District's favor.

It is a bedrock principle of this nation, dating back to our founding fathers and enshrined within the First Amendment of the United States Constitution, that the government cannot take actions that unduly favor one religion over another, or religion over non-religion. The relief Plaintiffs seek threatens to do just that. Granting the Plaintiffs' preliminary injunction motion provides the Fellowship of Christian Athletes special authorization for non-school persons to regularly attend club meetings, a privilege not afforded to any other student club, religious or secular. Moreover, such access would violate another Federal law, the Equal

Access Act. These harms greatly outweigh whatever harm student FCA members might suffer from continuing to hold their regularly scheduled meetings without an FCA employee present at every single one.

Finally, the public interest, represented here by the Defendant, in ensuring the safety and security of its buildings is paramount. It is only when students are physically safe and secure, can they actually exercise the rights granted to all citizens under the First Amendment. If Plaintiffs are unaware, school shootings in America have become more rampant and more visible in the past ten (10) years.[3] Additionally, New Jersey schools are facing serious legal repercussions arising out of lawsuits claiming sexual abuse at the hands of individuals who, even if they are not employed by a school district, obtained access to a student in a school building. As indicated, supra, if the District allows FCA, non-District affiliated persons to access its buildings on such a regular basis, it must allow all other individuals that same access. Further, should student-FCA clubs determine that they will meet daily, does that decision then require the District to allow FCA-national adults to attend every meeting, every day. Allowing this unfettered, "regular" access by individuals who are not affiliated with the District, compromises student and staff safety and security. Certainly, such an interest deserves to be honored by fully

---

[3] *School Shootings This Year: How Many and Where*, Education Week, January 1, 2026 updated September 3, 2026 https://www.edweek.org/leadership/school-shootings-this-year-how-many-and-where/2026/01 (last updated September 5, 2026).

developing a record that ensures that we "get this one right."

## **CONCLUSION**

For the reasons set forth above, Defendants respectfully request that the Court deny Plaintiffs' preliminary injunction motion.

Respectfully submitted,

**SCHENCK, PRICE, SMITH & KING, LLP**
*Attorneys for Defendants*
*Board of Education of the Hopewell Valley*
*Regional School District and Superintendent*
*Rosetta Treece, in her official capacity*

By: /s/ *Eric I. Bueide*
ERIC I. BUEIDE, ESQ. (EB-0268)

Dated: September 8, 2026